UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
Miami Division

Case Number: 88-1886-CIV-MORENO

UNITED STATES OF AMERICA,

    Plaintiff,

vs.

SOUTH FLORIDA WATER MANAGEMENT
DISTRICT, *et al.*,

    Defendants.
_____/

### ORDER GRANTING MOTION TO ADOPT THE SPECIAL MASTER'S REPORT, MOTION SEEKING DECLARATION OF VIOLATIONS, AND MOTION FOR DECLARATION OF BREACH OF COMMITMENTS

In the original 1992 Consent Decree, Judge William M. Hoeveler said: "The time has come, indeed has passed, when admitted problems facing the Everglades must be addressed." Once again, eighteen years later, the Court is faced with deciding the fate of Everglades restoration as envisioned in the Consent Decree. At the request of the United States, the South Florida Water Management District, and the Florida Department of Environmental Protection, the Court has, despite repeatedly expressing reservations, chosen "the easy path of inactivity in this case." The Court has chosen that path because of the near unanimity of the support by the United States, the South Florida Water Management District, the Florida Department of Environmental Protection, and the environmental groups[1] to promote the purchase of the U.S. Sugar Corporation's lands as envisioned by the State

---

[1] The environmental groups that have participated in this litigation are the Sierra Club, the National Wildlife Federation, Wilderness Society, National Parks and Conservation Association, the Defenders of Wildlife, Treasure Coast Environmental Coalition, Florida Audubon Society, Florida Wildlife Federation, Audubon Society of the Everglades, Florida Keys Citizens' Coalition, and the Environmental Defense Fund.

of Florida. Since the time of the Consent Decree, the commitment to the restoration of the Everglades by past Florida Governors Lawton Chiles and Jeb Bush has been praiseworthy, and present Governor Charlie Crist has expanded this commitment.

While the environmental groups laud the efforts of Governor Crist on behalf of the State of Florida, the land deal appears to be diminishing in size due to the challenges facing Florida's economy. The Court is now uncertain as to what role the downsized land purchase will play in Everglades restoration. Meanwhile, the projects devised years ago to remedy Consent Decree violations are waiting in a standstill. The State of Florida Parties have obligations for construction projects to comply with the original Consent Decree. The Court has an obligation to monitor the progress of those projects consistent with the Consent Decree.

Consistent with the Court's obligation, the Court adopts the Special Master's Report and Recommendation of July 5, 2006. Having adopted the July 5, 2006 report, the Court is giving judicial weight to the Special Master's remedial scheme. To the extent the remedial scheme is outdated, the Special Master should recommend realistic deadlines for the suite of remedies proposed in his initial Report, including the construction of the Everglades Agricultural Area Reservoir ("EAA A-1 Reservoir"). The Court does recognize that the State Parties have completed many of the remedies listed in the Special Master's Report, particularly work on STA 3/4 and Compartments B and C.

The Court also finds that the recent phosphorus exceedances in November 2008 and June 2009 in the Loxahatchee National Wildlife Refuge constitute violations of the Consent Decree and refers the matter for a remedial hearing before the Special Master. The Special Master is also tasked with holding an evidentiary hearing on the alleged violations that are in dispute.

Recognizing that science and technology have moved quickly since the inception of the Consent Decree, the Special Master may reconsider his original remedial scheme as set forth in his July 5, 2006 Report and Recommendation as he develops realistic deadlines for the remedies that have not been completed. Nothing in this Order precludes the parties from pursuing amendments to the Consent Decree, which the Court will consider, as is legally permissible, at a future date.

THIS CAUSE came before the Court upon the Miccosukee Tribe of Indians' Motion to Adopt the Special Master's Report **(D.E. No. 2065)** filed on **April 15, 2009**, Motion Seeking Declaration of Violations **(D.E. No. 2087)**, filed on **October 15, 2009**, and Motion for Declaration of Breach of Commitments made to the Special Master and Renewed Motion to Compel Completion of EAA Reservoir **(D.E. No. 2088)**, filed on **October 16, 2009**.

THE COURT has considered the motions, responses, oral argument, and the pertinent portions of the record, and being otherwise fully advised in the premises, it is

**ADJUDGED** that the motions are GRANTED.

## BACKGROUND

I. *Issues Referred to Special Master in the Court's June 1, 2005 Order*

Ruling on the Intervenor-plaintiff the Miccosukee Tribe's (the "Tribe") motion to declare violations of the Consent Decree, the Court required Special Master John Barkett to hold a hearing on "remedies and, if necessary on causation" and to issue a report and recommendation. *United States v. S. Fla. Water Mgmt. Dist. et al.*, 373 F. Supp. 2d 1338 (S.D. Fla. 2005). On July 5, 2006, the Special Master issued his Report and Recommendation.

A. *The Special Master's Report.*

1. *Were exceedances due to error?*

The Court's Order found the Florida Department of Environmental Protection ("FDEP") and the South Florida Water Management District ("SFWMD") (collectively referred to as the "State Parties") failed to present substantial evidence to show the exceedances of phosphorus levels in the Loxahatchee National Wildlife Refuge were due to error. Under the Consent Decree, an exceedance occurs if on two or more occasions, in twelve consecutive samples, the geometric mean at 14 Refuge sampling stations is greater than the Interim Level.[2] An exceedance in the phosphorus level is a violation of the Consent Decree unless the Technical Oversight Committee ("TOC"), established by the Consent Decree, determines there is "substantial evidence that it is due to error or extraordinary natural phenomena." (Consent Decree, App. B at B-5.) The Court's Order also found there were indeed two instances where the Interim Level was exceeded and the TOC did not make a finding of error or extraordinary phenomena. In reaching this conclusion, the Court rejected an argument that the exceedances were errors that lacked statistical significance. The Special Master was ordered to consider the causes of the exceedances and to report to the Court so it could then reconsider its ruling that the State Parties violated the Consent Decree.

Addressing the Court's concerns about the cause of the exceedances, the Special Master considered whether the State Parties presented substantial evidence that the exceedance was due to error other than sampling error. (Special Master's Report at 20-31.) In considering various expert reports, the Special Master concluded that the State Parties fell short of showing the necessary

---

[2]The Consent Decree defines the Interim Level according to a formula in the Consent Decree.

evidence that error caused the exceedances. (Special Master's Report at 31.) Put another way, the phosphorus problem at the Refuge is not explained by error or extraordinary natural phenomena.

## 2. *Is any remedy needed for STA 3/4?*

The Court's Order also addressed the issue of STA 3/4 (i.e. Stormwater Treatment Area), finding the Consent Decree required it to be operating by October 2003. Indeed, STA 3/4 was not operating by the Consent Decree's deadline. According to the State Parties, however, STA 3/4 was operating by the time the Court issued the June 2005 Order. The Court ordered the State Parties to provide proof to the Special Master that STA 3/4 was operating. The Special Master was directed to file a report with the Court on whether any remedy is necessary if STA 3/4 is operating at full capacity. Because STA 3/4 was to be fully operating by December 2006, the Special Master did not recommend an additional remedy at the time of his initial report. (Special Master's Report at 105.)

At this Court's March 16, 2010 hearing, the FDEP attorney indicated that the performance at STA 3/4 and Compartments B and C had greatly improved the water quality.

## 3. *What remedies are recommended to cure the violations?*

The Court directed the Special Master to focus on remedies for violations of the Consent Decree due to exceedances in the Loxahatchee Refuge. More specifically, the Court directed that the remedies require the State Parties to act in some definite manner.

The Special Master recommended that "the Court enter an order (1) directing the State parties to implement the projects identified on Appendix A by the end of the 'Late Construction Completion' time frames set forth on Appendix A; (2) directing the preparation by the District for presentation at each quarterly TOC meeting and addition to the Settlement Agreement Report showing the status of the projects on Appendix A in relation to the timetable set forth on Appendix

5

A as well as the status of the EAA Storage Reservoir project and the Bolles and Cross Canals Improvements project; and (3) directing the Special Master or the parties to inform the Court through status reports of the progress made in completing these projects." (Special Master's Report at 74.) The Special Master accepted SFWMD's request to use the 'Late Construction Completion' dates set forth in Appendix A. *Id.*

## II. *Violations of the Consent Decree*

On October 15, 2009, the Tribe filed another motion seeking a declaration of violations relating to phosphorus exceedances found in the Loxahatchee Refuge and the Everglades Protection Area in November 2008 and June 2009. The Tribe, the United States of America, and the State Parties agree that there has been a violation of the long-term phosphorus concentration levels of Appendix B in the Consent Decree in the Loxahatchee National Wildlife Refuge. The State Parties, at a December 1, 2009 hearing, requested the Court hold in abeyance the Tribe's Motion seeking a declaration of violations, until February 1, 2010. The Court, by not ruling, until now, effectively granted that stay. At a hearing on March 16, 2010, the State Parties and the United States again requested the Court hold the Tribe's motion in abeyance.[3] Moreover, the Tribe at the March 16, 2009 hearing emphasized that the State Parties and the United States were revising the phosphorus discharge limits from 10 ppb to 17 ppb.

Below is a summary of the parties' positions on recent violations of the Consent Decree:

---

[3] The United States had previously indicated that it would be filing an enforcement motion in the event negotiations with the State Parties were fruitless. To date, the United States has not filed such a motion. Accordingly, the United States' Conditional Motion for Status Conference to Establish Briefing Schedule for Enforcement Motion is denied with leave to file an enforcement motion, if appropriate.

*Tribe's positions on new violations*

A. There is a violation of the Consent Decree because the State parties have not complied with Load Reduction Requirements.

B. The phosphorus exceedances in the Everglades Protection Area constitute a violation of Appendix A of the Consent Decree.

C. The phosphorus exceedances in the Loxahatchee Refuge constitute a violation of the Consent Decree.

D. The State Parties are violating the Consent Decree by not employing Periphyton Stormwater Treatment Area ("PSTA") technology as a viable tool to prevent future violations.

E. There is a violation of the Consent Decree as to discharges into the Western Basins. The Special Master should hold an evidentiary hearing on this claim.

*State Parties' positions on new violations*

A. There is not a violation of the Load Reduction Requirements. (Hr'g Tr. 85, (Dec. 1, 2009).)

B. There is not a violation of the Consent Decree, Appendix A, level for discharges into Everglades National Park, but agree that further discussion as to the sampling method is necessary. (Hr'g Tr. 86, (Dec. 1, 2009).)

C. The State Parties do not deny that an exceedance of the Appendix B long-term phosphorus levels for the Loxahatchee Refuge occurred in June 2009, and, as a result, constitutes a violation of the Settlement Agreement and a violation within the meaning of Appendix B. Further, the State parties are not claiming that there is substantial evidence that this exceedance was due to error or extraordinary natural phenomena. At the December 1, 2009 hearing, the attorney for the SFWMD, indicated that there was an issue of contract interpretation as to determining which are the lower limits under the Consent Decree. (Hr'g Tr. 89, (Dec. 1, 2009).)

D. Both the United States and the State Parties have indicated that they have not yet decided to abandon the PSTA project, which is the subject of a separate Motion for Preliminary Injunction filed by the Tribe.

E. There is no violation of the Consent Decree as to discharges into the Western Basins. An evidentiary hearing before the Special Master is appropriate. (Hr'g Tr. 94, (Dec. 1, 2009).)

*United States's positions on new violations*

A. The United States does not agree with the methodology employed by the Tribe in reaching its conclusions about violations of the load reductions of the Consent Decree.

B. The United States is not yet in a position to assess the Tribe's allegations about compliance for the Everglades National Park with the Consent Decree's water quality requirements because water quality data concerning discharges to Everglades National Park during the water year ending September 30, 2009 are not yet available.

C. The Tribe's motion is correct that there was a violation of the long-term levels in the Loxahatchee National Wildlife Refuge under Appendix B of the Decree in November 2008 and June 2009.

D. Both the United States and the State Parties have indicated that they have not yet decided to abandon the PSTA project, which is the subject of a separate Motion for Preliminary Injunction filed by the Tribe.

E. As to the discharges into the Western Basins, the United States is concerned about the progress of implementing control programs for other watersheds outside of the EAA discharging into the Everglades Protection Area under Appendix C of the Consent Decree.

The State Parties and the United States have been meeting to propose amendments to the Consent Decree. At this Court's March 16, 2010 hearing, the State Parties and the United States agreed to allow the Tribe and Farm Interests to participate in the discussions. The State Parties and the United States anticipate that an Amended Consent Decree would be before the Court in October, 2010.

III. *Completion of the EAA A-1 Reservoir*

The construction of a deep-storage reservoir in the Everglades Agricultural Area ("EAA") is a listed project under the Comprehensive Everglades Restoration Plan, ("CERP"), mandated to be built pursuant to Section 601 of the Water Resources Development Act of 2000 ("WRDA 2000"),

Pub. L. No. 106-541, 114 Stat. 2572 (2000)[4]. WRDA 2000 allocated $116,704,000 in federal funds toward the EAA Storage Reservoir project.

Some parties point out that construction of the EAA A-1 Reservoir was not technically part of the remedies recommended by the Special Master on July 5, 2006. While the EAA Reservoir and the Bolles and Cross Canals Improvements projects were not part of the Appendix A schedule of remedies attached to the Special Master's Report, the Special Master did address these projects in his report. He stated: "The Special Master recognizes that the EAA Storage Reservoir project and increasing the conveyance capacity of the Bolles and Cross Canals are not projects listed on Appendix A. They are currently projected to be completed by 2010. At this time, the Special Master is recommending that the progress of this work also be monitored by the Court." (Special Master's Report at 75.) At the December 1, 2009 hearing, the State Parties admitted to committing to the Special Master to build the EAA A-1 Reservoir. (Hr'g Tr. at 70 (Dec. 1, 2009).)

The Tribe has filed a renewed motion claiming that the SFWMD breached its promise to the Special Master to complete the EAA A-1 Reservoir and the Bolles and Cross Canals projects. The Tribe takes the position that Governor Crist and the State Parties, joined by the environmental groups, have oversold the benefits of the land acquisition and downplayed the benefit of the construction on the EAA A-1 Reservoir. According to the Tribe, the SFWMD paid the contractor

---

[4]Section 601(C)(ii) of WRDA 2000 specifically lists the project as follows:
> INITIAL PROJECTS.--The following projects are authorized for implementation, after review and approval by the Secretary . . .
> (ii) Everglades Agricultural Area Storage Reservoirs--Phase I, at a total cost of $233,408,000, with an estimated Federal cost of $116,704,000 and an estimated non-Federal cost of $116,704,000.

on the EAA A-1 Reservoir Project $12 million in termination damages. On August 26, 2009, Palm Beach Circuit Judge Donald Hafele only approved $650 million of the $2.2 billion in bonds sought to purchase the land and build projects. *See S. Fla. Water Mgmt. Dist. v. State of Fla.*, Case No. 50-2008-CA-031975 (Aug. 26, 2009) ("Bond Validation Order"). This translates into 73,000 acres to be purchased with no money to buy the remaining 107,000 acres or to construct any projects on the land. *Id.* at 19-20. Of the 73,000 acres, 40,000 are in the EAA and 33,000 are citrus groves located outside the EAA. (*See* Land Acquisition Map); (Hr'g Tr. 76, (Dec. 1, 2009).) All of the 73,000 acres are to be leased back to U.S. Sugar after closing with the State being able to recover only 10,000 acres in the first 10 years. (Hr'g Tr. 75, 81 (Dec. 1, 2009).) Judge Hafele's case is under review by the Florida Supreme Court.

### 1. *Natural Resources Defense Council, Inc. et al. v. Army Corps of Engineers*, Case No. 07-80444-CIV-MIDDLEBROOKS

When the Tribe first requested that the Court compel completion of the EAA A-1 Reservoir, the Court found the issue was not ripe for adjudication because the validity of the permit to complete the EAA Reservoir was at issue in a case before Judge Middlebrooks. *Natural Res. Def. Council, Inc. v. Army Corps of Eng'rs*, Case No. 07-80444-CIV-MIDDLEBROOKS. Finding the EAA reservoir project was not going forward, Judge Middlebrooks ruled there "no longer is a real 'case' or 'controversy' to decide, and continued litigation could interfere with the cooperative efforts of the political branches of government." *Id.*

The Natural Resources Defense Council, National Wildlife Federation, and Sierra Club filed the action challenging the issuance of a permit by the Army Corps of Engineers to the SFWMD. These environmental groups maintain the Corps violated the WRDA 2000 by issuing a permit for the EAA A-1 Project without satisfying the substantive requirements to the act and its implementing

regulations and violated the National Environmental Policy Act, 42 U.S.C. § 4321, ("NEPA") by allowing the project to proceed without ensuring that the EAA A-1 Project complied with NEPA's statutory requirements. There is also a claim that the Corps violated the Administrative Procedure Act in its issuance of the permit.

In August 2006, the SFWMD had begun construction on the EAA A-1 Project, but work was suspended on June 1, 2008 in view of the land acquisition deal. As of the date of Judge Middlebrooks's order, work had not resumed. The environmental groups in Judge Middlebrooks's case conceded that plans to proceed with the EAA A-1 Project appear "very much in doubt" as the SFWMD has "cancelled construction contracts and is in the process of considering a wide range of plans for the lands on which the EAA A-1 Project would have been constructed, plans for development of the EAA land are uncertain, and none of the current plans appear to include a reservoir on the A-1 lands." *Natural Res. Def. Council, Inc. v. Army Corps of Eng'rs*, Case No. 07-80444-CIV-MIDDLEBROOKS. The SFWMD maintained its position that Judge Middlebrooks could adjudicate the dispute as the permit was open until 2011. *See id.* In view of the construction being suspended, Judge Middlebrooks declined to adjudicate whether the permit was valid. *See id.*

## LEGAL STANDARD

Federal Rule of Civil Procedure 53 authorizes parties to file objections to the Master's report or recommendations. Specifically, Rule 53(f)(3) provides "the court must decide *de novo* all objections to findings of fact made or recommended by a master, unless the parties, with the court's approval, stipulate that . . . the master's findings will be reviewed for clear error." The Court in its February 2, 2004 Order Clarifying Role of Special Master indicated that it would review the Special Master's findings *de novo*. In addition, the Court has a duty to decide *de novo* all objections to

conclusions of law made or recommended by a master. Fed. R. Civ. P. 53(f)(4).

To the extent any objections to the Special Master's Report involves a dispute over interpretation of the Consent Decree, the Eleventh Circuit applies "the same rules that govern contract interpretation when we interpret a consent decree, because a consent decree is essentially a form of contract." *Reynolds v. McInnes*, 338 F.3d 1201, 1211 (11th Cir. 2003).

## ANALYSIS

### I. Motion to Adopt the Special Master's Report

A. *The Special Master's Findings on Error*

The Special Master determined the State Parties did not carry their burden of proof that error caused the exceedances. After evaluating expert reports for all parties, the Special Master opined as follows:

> '[E]rror' in the definition of 'violation' does not contemplate rewriting the formula for an 'exceedance' so that it represents a 10% rejection level instead of a 34% rejection level. Such a result would require a conclusion that parties intended much less than a 10% rejection rate to establish the Interim Level and that the parties intended that an 'exceedance' should be determined by reference to a 10% rejection level. The words of the Consent Decree do not permit either conclusion. They unambiguously say that the Interim Level is determined by reference to a formula that represents a 10% rejection rate, and they do not tie an 'exceedance' to any statistical rejection rate.

(Special Master's Report at 19-20 (internal footnote omitted).) Put another way, instead of proving error, the State Parties argued there was not an "exceedance" to begin with because the Consent Decree's formula was wrong. *Id.* at 20. The Special Master concluded "[t]hat argument is foreclosed by the terms of their bargain." *Id.*

The State Parties argue the Special Master failed to consider evidence showing that in each case of an exceedance, there was a 34% likelihood that phosphorus levels were, in fact, meeting the requirements of the Decree and only violated the Decree due to a statistical process employed in Appendix B (i.e. false positives or Type I error). The State Parties argue that by disregarding expert testimony showing the data set used to create Appendix B was limited, the Special Master failed to conclude the equation erroneously predicted phosphorus levels lower than those the Decree contemplated (i.e. model error or bias).

The bottom line on the State Parties' position -- a decree that provides "error" will be considered to decide whether there is a violation does not put the State on notice that only "sampling error" will be considered and other common types of error such as false positives, Type I error, model error or bias -- would not. The State Parties misread the Special Master's Report. The Special Master admits at the outset that there is no evidence of sampling error and proceeds with a thorough discussion of whether the State Parties have proved error. (Special Master's Report at 20-31.) He examines the varying definitions of error from the various experts. Evaluating the equation at issue to determine error, the Special Master writes: "The Appendix B equation may be biased but, if it is, the parties apparently intended it to be biased. They apparently sought what the State Parties now regard as a test that overpredicts excursions." (Special Master's Report at 28.)

Rather than show error, it appears the State Parties are arguing to modify the Consent Decree's equation for determining whether an exceedance is due to error. The Master writes:

> [T]he Consent Decree provided in 1992 that a panel of scientists 'designated by the TOC will track and evaluate compliance with all aspects of state water quality standards including the phosphorus limits, concentration levels and criteria.' Had such a panel been formed and performed the independent role apparently contemplated

13

> for it by the Consent Decree and had the research program contemplated in 1992 by the Consent Decree relative to phosphorus hydrodynamics in the Refuge been undertaken by the State parties and the United States as the Consent Decree provided, perhaps the parties would have an objective, independent framework within which to evaluate the results of the Appendix B equation and the parties' experts would not be having this debate. But the panel was not formed. The research is not completed. And the issue of modifying the Appendix B Interim Level equation is not before the Special Master.

(Special Master's Report at 30-31.) Likewise, the Court is being asked to enforce the Consent Decree, not modify it. After reviewing the arguments and evidence presented by both sides *de novo*, the Court agrees with the Special Master. What the State Parties are seeking is a modification of the equation to calculate error. That cannot be done in this context even if the equation is biased. Accordingly, the Court concurs the State Parties failed to carry the burden of showing error as set forth in the Consent Decree. The Court affirms its prior ruling that violations of the Consent Decree occurred. Of course, in their negotiations, the parties are free to re-evaluate the equation and submit the proposal as part of an amended Consent Decree, which the Court would review to determine legal permissibility.

B. *The Special Master's Recommendations on Remedies*

Even though there have been violations, the United States and the State Parties have not sought a civil remedial order. Claiming they have agreed to a remedial scheme as set forth in Appendix A, the United States and the State Parties have argued that entry of a remedial order requiring the State Parties to implement the projects in Appendix A is unnecessary. Additionally, the State Parties and U.S. Sugar raise the argument that absent a finding of civil contempt, the Court lacks legal authority from entering such an order. Not true. The argument disregards the function

reserved for the Court under the Consent Decree to order the State Parties to implement an additional remedial scheme where the Court is resolving a dispute following a violation. Paragraph 10B of the Consent Decree provides as follows:

> [I]f the concentration limits and levels are violated, then the State Parties will implement additional remedies, such as any necessary expansion of STAs, more intensive management of STAs, a more stringent EAA regulatory program, or a combination of the above. The State Parties shall not implement more intensive management of the STAs as the sole additional remedy.

Moreover, paragraph 19 of the Consent Decree provides a three-step process to resolve any disagreements over additional remedies the State Parties must implement pursuant to paragraph 10B. The first step is that the party seeking relief shall notify the other parties by certified mail, return receipt. Representatives of the parties shall meet within fifteen days to resolve the issues. If after meeting, the parties cannot resolve the issues, then the parties go to mediation. Finally, if there remains disagreement about additional remedies following a violation, the parties seek judicial intervention. The Tribe has invoked the Court's intervention pursuant to this process. To say the Court has no role unless there is a finding of contempt belies the Consent Decree's three-step process.

Aside from the explicit language in the Consent Decree, this Court has already found that a "proposed non-binding 'remedy,' or one where the parties are not obligated by the consent decree to perform, is no remedy at all." *United States v. S. Fla. Water Mgmt. Dist. et al.*, 373 F. Supp. 2d at 1346-47. "This Court's power to enforce the consent decree is not limited to vague remedial proposals, most of which the State agencies are already bound to do, as per the Consent Decree." *Id.* at 1347. The Special Master's recommendation to judicially mandate the State Parties to

implement the projects described in his report ensures that *specific* acts will be performed. *See id.*

At the same time, the projects described in the Master's report may reasonably remedy the violations and are not excessive, as is evidenced by the State Parties' completion of several Appendix A projects since the July 5, 2006 report. Indeed, Appendix A is a list of the State Parties' own projects and their own deadlines. There is disagreement as to what deadlines have been met. Accordingly, the Court orders the State Parties to implement the projects in Appendix A, to the extent they are incomplete, and requests the Special Master recommend realistic mutually-agreeable deadlines, as necessary, for the Appendix A projects. Of course, in reviewing the remedies set forth in Appendix A, the Special Master retains the discretion to evaluate the effectiveness of past projects that may no longer be effective remedies. For example, the United States shall evaluate the effect of the more stringent water quality requirements set forth on January 1, 2007, which the United States claims supersedes the remedies in Appendix A.

The other remedial recommendation the Court must consider is whether to accept periodic reports from the parties on the progress of the restoration effort. To avoid unnecessary judicial intervention in this case, the parties are ordered to continue to advise the Special Master and not the Court with the periodic reports listed in the Master's Report and Recommendation. When the three-step process for dispute resolution requires the Court to intervene in the Everglades restoration project, the parties will fully advise the Court of all progress at that time.

## II. <u>Motion for Declaration of Violations</u>

There is no dispute that the phosphorus exceedances in November 2008 and June 2009 in the Loxahatchee Refuge constituted violations of the Consent Decree. In addition to the phosphorus exceedances in the Loxahatchee Refuge, which the State Parties concede are not due to error, the

Tribe argues there are a number of violations of the Consent Decree. Remaining at issue, are the following violations:

- Compliance with the Consent Decree's Load Reduction Requirements

- Whether the phosphorus exceedances in the Everglades Protection Area constitute a violation of Appendix A of the Consent Decree.

- Whether the State Parties are violating the Consent Decree by not employing Periphyton Stormwater Treatment Area ("PSTA") technology as a viable tool to prevent future violations.

- Whether discharges into the Western Basins constitute a violation of the Consent Decree.

At Oral Argument on December 1, 2009 the United States indicated that these allegations of violations needed to be "sorted out." (Hr'g Tr. 19 (Dec. 1, 2009).) The Court finds that an evidentiary hearing before the Special Master is the appropriate venue to do so. In that hearing, the Special Master shall also address the Tribe's contention that the Consent Decree requires that phosphorus discharges be limited to 10 ppb Everglades-wide, as opposed to the 17 ppb goal. The Special Master shall also hold a remedial hearing to address the admitted violations. If the Special Master determines there are other violations of the Consent Decree, as alleged by the Tribe, the Special Master shall hold a remedial hearing to consider the options to correct the deficiencies.

### III. Motion for Breach of Commitments and to Compel Completion of the EAA Reservoir

Likening the deal between the United States and Florida to British Prime Minister Neville Chamberlain's deal bargaining away Czechoslovakia in 1938, the Tribe argues the United States here bargained with the SFWMD to give up part of the Everglades by allowing the State Parties to violate

express commitments. The Tribe wants the Court to draw a line in the muck and require the State Parties to abide by prior commitments. Although the partial sugar land acquisition may be in the best interest of the Everglades in the very distant future, the Tribe's environmental suffering is immediate. The Court recognizes the complications of acquiring the vast acreage proposed and the apparent financial difficulties in attaining the original goal. But it is not the role of the Court to negotiate with competing land owners or to manage the treasury of the State Parties. Those functions are left to the other two branches of government. It is the Court's function to resolve the disputes pending before it. The Court has waited almost four years since the Special Master's Report of July 5, 2006. The good faith efforts by the Governor, the State Parties and the United States cannot continue to prevent the Court from acting.

Federalism concerns are heightened when, as in this case, a federal court decree has the effect of dictating state or local budget priorities. *Horne v. Flores*, __ U.S. __, 129 S. Ct. 2579, 2593 (2009). Federal Rule of Civil Procedure 60(b)(5) permits a party to obtain relief from a judgment or order if, among other things, "applying [the judgment or order] is no longer equitable." Fed. R. Civ. P. 60(b)(5). The Rule provides a means by which a party can ask a court to modify or vacate a judgment or order if "a significant change either in factual conditions or in law" renders continued enforcement "detrimental to the public interest." *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 384 (1992).

A Rule 60(b)(5) motion is not before the Court. The State Parties have not moved to amend the remedial commitments made to the Special Master to remedy Consent Decree violations. Rather, before the Court is the Tribe's Motion to Compel Completion of the EAA A-1 Reservoir. At the December 1, 2009 hearing, the State Parties admitted to committing to the Special Master to build

the EAA A-1 Reservoir. (Hr'g Tr. 70 (Dec. 1, 2009).) The Special Master in his report recognized that the Court should monitor the construction of the EAA Reservoir and the Bolles and Cross Canals projects.

The Court has afforded a good deal of time for the parties to pursue the land deal and determine its viability before compelling the construction of the EAA A-1 Reservoir. Indeed, the Court is only now adopting the Special Master's Report of July 5, 2006. By doing so, the Court is giving judicial weight to the Special Master's recommendation that the EAA A-1 Reservoir be constructed. Circumstances have changed despite the best efforts of Governor Crist and the State Parties to materialize a deal that would benefit Everglades Restoration, beyond the benefits of the EAA A-1 Reservoir. The Tribe, however, has convinced this Court with its practical arguments that their lands will ultimately be sacrificed to nutrient pollution and the time has come for the Court to require the parties to abide by commitments made in this litigation. The State Parties have not denied that they committed to build the EAA A-1 Reservoir. The Court cannot allow parties to a Consent Decree to abandon projects when new opportunities arise unless the proper process is employed to amend those commitments.

The Court acknowledges that compelling construction of the EAA A-1 Reservoir may reactivate Judge Middlebrooks's case. There is no reason to postpone that litigation regarding the validity of the permit to construct the EAA A-1 Reservoir. The time is now to go forward with the work that needs to be done on this project, which all parties agreed to be important. The Court refers this matter to the Special Master to recommend realistic deadlines for work on this project, if he deems them appropriate, and taking into consideration any litigation regarding the permit. Of course,

the parties remain free to employ Rule 60(b)(5) and seek amendment of the Consent Decree to deal with changed circumstances and opportunities.

DONE AND ORDERED in Chambers at Miami, Florida, this 31st day of March, 2010.

_____
FEDERICO A. MORENO
UNITED STATES DISTRICT JUDGE

Copies provided to:

Counsel of Record