UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Miami Division

**Case Number: 88-1886-CIV-MORENO**

UNITED STATES OF AMERICA,

      Plaintiff,

vs.

SOUTH FLORIDA WATER MANAGEMENT
DISTRICT *et al.*,

      Defendants

_____/

## REPORT OF THE SPECIAL MASTER (FEBRUARY 11, 2011)

Periphyton refers to an assemblage of algae, diatoms, and other micro-organisms that grow naturally in the Everglades ecosystem.[1]  A stormwater treatment area (STA) cell that contains periphyton is a "PSTA" cell.  Periphyton, especially periphyton that grows over a limestone base or "substrate," instead of peat, is effective in removing phosphorus from water but there remains scientific uncertainty regarding the optimum phosphorus load that a PSTA cell can handle.  Too high of a phosphorus inflow concentration in water entering a PSTA and the periphyton may not be effective.  Too low of a phosphorus inflow concentration in water before routing to a PSTA will not give scientists enough information about the efficacy of a PSTA vis-à-vis other vegetation capable of removing phosphorus.  Happiness for STA designers is (a) a properly sized and constructed STA (b) with the best combination of vegetation technologies—cattail, submerged aquatic vegetation (SAV), or periphyton, for examples—that will cost-

---

[1] PSTA Exhibit 101 (Goforth), p. 10.

effectively reduce phosphorus inflow concentrations to an outflow concentration of a long term geometric mean of 10 parts per billion (ppb) in the receiving water bodies.[2] For purposes of the Consent Decree[3] in this matter the receiving water bodies mean the Loxahatchee Wildlife Refuge and Everglades National Park.[4]

In its "Order Granting Motion to Adopt the Special Master's Report, Motion Seeking Declaration of Violations, and Motion for Declaration of Breach of Commitments" dated March 31, 2010 ("March 31 Order"), the Court referred to me for a Report and Recommendation this question: "whether the State Parties are violating the Consent Decree by not employing PSTA technology as a viable tool to prevent future violations."[5]

The answer to this question is "no." The Consent Decree does not contain a requirement that an STA employ periphyton or that a PSTA cell reside within an STA, and does not define a "violation" as a failure to employ either within an STA. Rather, the Consent Decree establishes long-term concentration levels which must be met within the Refuge and the Park, and requires more stringent maximum annual discharge limits than 50 parts per billion for water leaving an STA and entering the Refuge if the lower of the

---

[2] Happiness for water managers is having the right amount of water in the right places all of the time so that they can route water to an STA within the STA's design parameters for sufficient hydraulic residence time (HRT) to allow the vegetation within the STA to remove the maximum amount of phosphorus. STA designers want to get it right the first time if they can because STAs cost many millions of dollars to build. Water managers just have to pray a lot that Mother Nature is kind to them.

[3] I refer to the Consent Decree or Settlement Agreement interchangeably in this Report.

[4] In the matter before Judge Gold (*Miccosukee Tribe v. United States,* Case No. 1:04-cv-21448 (S.D. Fla.)), the receiving water bodies are the Refuge as well, but also Water Conservation Areas 2 and 3 since all of the STAs discharge into one of these water bodies and all of the STAs are permitted under the Clean Water Act, the proper enforcement of which with respect to STA discharges is an issue before Judge Gold.

[5] The other matters referred by the Court in the March 31 order are the subject of the Report of the Special Master dated January 4, 2011 except for one—remedies for the admitted violation of Appendix B of the Consent Decree in the Refuge. That issue is the subject of a hearing that will begin on February 14, 2011.

Class III numeric phosphorus criterion or long term limit is not met after December 31, 2006,[6] but leaves to the South Florida Water Management District (District), with input from the Technical Oversight Committee (TOC), the task of designing STAs that satisfy these obligations.

Intervenor, the Miccosukee Indian Tribe of Florida (Tribe), believes that the District cannot satisfy these Consent Decree obligations unless PSTA cells are employed within each STA.  It believes that a PSTA demonstration project that was operated for about 15 months within STA1-E must be completed not only to justify this belief but also to satisfy the research obligations contained within the Consent Decree.  Hence, it seeks an order from the Court requiring, under the terms of the Consent Decree, the District or the United States[7] to continue this demonstration project.

Irrespective of the merits of the PSTA demonstration cell project, I both find and conclude that the Consent Decree does not oblige the District or the United States to continue this project.  Hence, I recommend that the Tribe's motion with respect to the continuation of this project be denied.

---

[6] I discussed the Class III numeric criterion and the related provisions of the Settlement Agreement at length in the Report of the Special Master (January 4, 2011).

[7] The Tribe's Motion Seeking a Declaration of Violations [D.E. 2087] was filed in October 2009 and argued that the failure to continue with the PSTA study in STA-1E violates the State's obligations under the Settlement Agreement to research and modify STAs to achieve the Class III numeric phosphorus criterion.  [D.E. 2087], p. 13.  There was no mention in the motion of a violation of the Settlement Agreement by the United States.

# Organization of This Report

This Report and Recommendation is organized as follows:

Organization of This Report .......................................................................................... 4

Procedural Background.................................................................................................. 4

Factual Background ...................................................................................................... 5

Tribe's Contentions...................................................................................................... 25

Analysis........................................................................................................................ 28

Conclusion ................................................................................................................... 32

# Procedural Background

The parties agreed to a one-day hearing on January 19, 2011 on the PSTA issues. There were no prehearing or posthearing briefs.  Rather, at the request of the Special Master, the Tribe submitted on December 31, 2010, a "Notice of Legal and Factual Contentions Regarding Alleged Violation of the Research Requirements of the Consent Decree" (Tribe's Notice of Contentions) to frame the issues for resolution.  I discuss these contentions in detail below.

Three witnesses appeared in person at the hearing and were cross examined:

(1)  Ronald Dean Jones, Ph.D., Professor of Biology, Portland State University, for the Tribe;

(2)  Eric Bush, Assistant Chief of the Everglades Division of Jacksonville District for U.S. Army Corps of Engineers, for the United States, and

(3)  Gary Goforth Ph.D., President and Principal Engineer, Gary Goforth, Inc., for the District.

A fourth witness, Terry L. Rice, Colonel (retired), Ph.D., President, T.L. Rice, LLC, submitted an expert report in support of the Tribe's position, but all parties waived cross examination and Dr. Rice, who was recovering from surgery, was excused from appearing in person.

Immediately following the hearing I heard oral argument from all counsel.

## Factual Background

The relevant facts are not in dispute.  The Army Corps of Engineers (ACOE or Corps) has a pilot PSTA demonstration project in place in STA-1E.  The pilot project is supervised by Dr. Jones through a cooperative agreement between the ACOE and Portland State University.

The June 2006 "Operations Plan for the STA-1E Cells 1-2 PSTA/SAV Field-Scale Demonstration Project" prepared for the ACOE by its contractor, SAIC, contains a description of the project:

> Natural TP levels within the Everglades waters are generally below 10 ppb.  Traditional wetlands-based STA technologies cannot reduce phosphorus concentrations to these natural levels.   Thus, the C-51/STA-1E Project is designed to demonstrate an innovative treatment technology at a field-scale to improve the water quality by reducing TP concentrations in the discharge to 10 ppb or better so that it may be diverted to Water Conservation Area (WCA) 1 in the Loxahatchee National Wildlife Refuge (LWNR), located in Palm Beach County, Florida.
>
> The U.S. Army Corps of Engineers (USACE), Jacksonville District, has been pilot testing a biotechnology known as the periphyton stormwater treatment area (PSTA) to achieve greater phosphorus reduction.   These tests have successfully demonstrated the PSTA ability to produce effluent water TP concentrations at or below 10 ppb.

PSTA Ex. 202, p. 1.

The STA-1E PSTA demonstration cell followed a field demonstration in what is called the "C-111 spoil mound removal area," and a "mesocosm" scale (one hundred feet long by ten feet wide) demonstration called the "Flying Cow Road Test Facility." Ex. 232 (Jones), p. 3; Transcript (Tr.), 15-16. The C-111 project was in an area where a levee was removed exposing the limestone surface. Periphyton formed and from August 2000 through June 2003, phosphorus concentrations were measured. The results were favorable, with median phosphorus concentrations running at below 7 ppb. Ex. 232 (Jones), p. 3; Tr. 15-16 (Jones).

The Flying Cow Road test facility was built in 1999-2000 and is still in operation today. PSTA Ex. 232 (Jones), p. 3. It "demonstrated the great potential" for a PSTA cell to be used as a final polishing step to bring phosphorus levels in stormwater down from 20 ppb or higher to 10 ppb or less. *Id.* Tr. 10, 16 (Jones). The Flying Cow Road test facility results provided the justification for construction of the PSTA demonstration project in STA-1E. PSTA Ex. 232 (Jones), p. 3; Tr. 144 (Bush).

The goal of the demonstration project was straightforward. Build PSTA cells with different types of limestone substrates. Push phosphorus-laden stormwater through the PSTA cells to determine the phosphorus-reduction capabilities of each cell/substrate combination compared to STA cells on different substrates containing other forms of vegetation or other configurations of vegetation (which might include periphyton but not solely periphyton). If the PSTA cells performed well, then STA designers would have data to support the design and cost of PSTA cells to retrofit existing STAs or to incorporate PSTA cells into new STAs.

The PSTA demonstration project contained three different PSTA cells each about 47 acres, Tr. 16 (Jones), and each with a different lime "substrate" or base.  Cell A's substrate consisted of lime sludge.  Cell B's substrate consisted of limestone brought in from another location.  Cell C's substrate consisted of onsite limestone.  PSTA Ex. 209, p. 1-2.

Dr. Jones explained that the periphyton mat, when exposed to sunlight, raises the pH in the mat.  At a higher pH, calcium carbonate is formed.  When calcium carbonate comes into contact with phosphorus in the water, calcium phosphate is then formed.  The calcium phosphate "precipitates out" or settles to the bottom, "to form a marl soil."  The phosphorus that was formerly in the water instead is sequestered in this marl soil.  Tr. 10-13 (Jones).

In contrast, an STA built over organic soils does not sequester phosphorus as effectively as calcium carbonate does.  Phosphorus will be captured by vegetation in the STA which will eventually die off and become part of the organic soils in the STA but some of that phosphorus will move back into the water column (a process referred to as "flux" or "reflux").  Tr. 11, 22-24 (Jones); Tr. 179 (Goforth).  Eventually—perhaps every fifty years—the organic soils in the STA will have to be removed.  In contrast, the marl soils in a properly constructed PSTA cell may not have to be removed for as long as 200-500 years.  Tr. 12 (Jones).[8]

Unfortunately, even though the Operations Plan for the STA-1E PSTA demonstration project was completed in 2006 and the project was supposed to be

---

[8] Dr. Jones also explained that periphyton offers another advantage over submerged aquatic vegetation (SAV) in an STA.  In drought conditions, SAV will die off and decompose, whereas periphyton is a "drought-tolerant" community and will reestablish itself when drought conditions end.  Tr. 28-30 (Jones).

completed by 2008, the project did not begin operations until 2008 and then just for three months.  PSTA Ex. 1 (Bush), p. 4, Tr. 132 (Jones).  It was then shut down and did not restart until February 2010 and was not "fully operational" until June 2010, for, at least, three reasons: (1) the need for repairs to STA-1E; (2) a change in contractors by the Corps, and (3) drought conditions that precluded delivery of water for treatment to the PSTA cells.  PSTA Ex. 232 (Jones), p. 3; Tr. 16-17 (Jones); 132 (Jones), 154 (Bush), 158-59 (Bush).

The efficacy of the PSTA demonstration project is discussed in a series of monthly reports dated February 2010 through September 2010, PSTA Ex. 209-216.  Generally speaking, the overall results were positive. Tr. 18 (Jones).  Cell C, the cell with the onsite limestone substrate, performed the best.  PSTA Ex. 215, p. 2.  However, inflow concentrations were low.  For example, in August 2010, the inflow concentrations into Cell C were between 10 and 12 ppb.  *Id.*  In the report for May 2010, with respect to Cell C's performance, the report author wrote: "The exact efficiency of performance continues to be elusive as the concentration differential between input and effluent water is minimal."  PSTA Ex. 212, p. 3.  See also Tr. 31 (Jones) ("I would say the average is between 10 and 14 [ppb] coming into the PSTA cells"); Tr. 155 (Bush) (acknowledging that outflow concentrations from the PSTA cells were below 10 ppb but also acknowledging that inflow concentrations into the PSTA cells were often at or below 10 ppb).  See also PSTA Ex. 101 (Goforth), p. 33 (calculating the average inflow concentration for STA-1E Cell A at 8 ppb for the period 2008-2010); Tr. 192-94 (Goforth) (explaining his calculations).

While Dr. Jones felt there is enough data to just build PSTA cells "and get it over with," Dr. Jones said that the data were "not positive enough to go ahead with a full scale implementation in the eyes of those who review it." Tr. 19.  He explained:

> THE WITNESS:  Well, if you want to go through a peer review process of having other scientists and engineers look at the data, you need to have enough data to adequately evaluate this.  When we had the STA design group for PSTA, when we had this group formed, there was a suggestion that we needed to go through two to five years of operation before the data would be accepted, and we settled on two years, meaning that that was all we thought we could legitimately afford at the time.  And we thought we could be convincing after two years of data collection.
>
> THE SPECIAL MASTER:  Okay.  Is the science that you described earlier in your testimony the subject of dispute?
>
> THE WITNESS:  I don't believe so.  I think it's more of the engineering and the technology components of it, how do you scale one of these things up.  We want to make sure we don't make it too big because it will be too expensive.  You don't want to make it too small because then it won't be effective.  So you need to know how big to make these things and we need enough data to be able to size them adequately.  And then you also want to know of their longevity.  That is the subject of people's questions.

Tr. 19-20.

The STA-1E project's continuation was in jeopardy by at least February 2010. During a "Joint Project Review Board" meeting between technical staff at the District and the Corps, Corps management accepted a recommendation from Mr. Bush and District Staff to discontinue the project.  PSTA Ex. 1 (Bush), p. 5; PSTA Ex. 4, p. 2; Tr. 153 (Bush).   After giving notice to Dr. Jones of this conclusion, the Tribe filed its motion

to enjoin the Corps from stopping the project.  [D.E. 2122].[9]  The Corps then decided to continue the project for at least thirty days and later committed to give the Tribe forty-five days' notice prior to taking any action that would impair the PSTA facilities in STA-1E.  PSTA Ex. 11; PSTA Ex. 1 (Bush), p. 5.

The Corps consulted with the Tribe's staff in April 2010 and decided to continue the project through December 31, 2010, the end date in the cooperative agreement with Portland State University.  PSTA Ex. 14; PSTA Ex. 1 (Bush), p. 6.

As is discussed in more detail in the Report of the Special Master dated January 4, 2011, on September 3, 2010, the Environmental Protection Agency (EPA) issued its Amended Determination in response to Judge Gold's April 14, 2010 order in *Miccosukee Tribe v. United States*, No. 04-21448 (S.D. Fla.).  As part of EPA's vision of the best use of STA-1E to achieve the Water Quality Based Effluent Limitation (WQBEL) that it promulgated in its Amended Determination, EPA announced that the PSTA cells in STA-1E should be decommissioned:

> Cells 1 and 2 in STA 1E are temporarily operating at a decreased hydraulic capacity for an (sic) USACE pilot project (Periphyton Stormwater Treatment Area, or PSTA) which decreases the effective treatment area of the STA. Repairs, re-grading, decommissioning the pilot project, and establishment of the treatment system vegetation are all needed for STA 1E to ultimately meet the WQBEL.  In the interim, before flow can be diverted to STA 1W, the repairs and modifications to STA 1E, when completed will significantly improve the performance of the facility in reducing TP concentrations in the outflow water.  For this reason, the repairs to STA 1E need to be made as soon as practicable so that the STA is delivering less TP to the Refuge, although full compliance with the WQBEL will

---

[9] The motion was styled as one for "an  Emergency Temporary Restraining Order and Preliminary Injunction Against the United States, United States Army Corps of Engineers, to Prevent the Cancellation of the PSTA Project."

not occur until the expanded STA 1W complex is operational and available to take flows away from STA 1E.

The USACE has either entered into contracts or is seeking approval to complete certain repairs to STA 1E. The anticipated schedule of repairs is built into the following milestones. <u>The State of Florida will need to work with the USACE and the District so that the following actions are completed in the time frames specified below to bring STA 1E to full operational capacity by the dates in the STA 1E summary table below</u>.

…

| Activity Milestone | Date to Complete Activity |
|---|---|
| Decommission USACE PSTA pilot project (after consultation with the Tribe) | September 30, 2011 |

PSTA Ex. 15, p. 24 (emphasis in original); PSTA Ex. 1 (Bush), p. 6.

Despite EPA's announced view of the project, in a letter dated October 7, 2010, the Corps offered to transfer the PSTA cells to the District to continue the pilot study. PSTA Ex. 16. The Corps apparently was seeking to give the District the option of including the PSTA cells in a response to the Amended Determination since EPA had in the Amended Determination allowed the State Parties a sixty-day window within which to propose alternatives to EPA's approach. PSTA Ex. 15, p. iii. By letter dated October 26, 2010, the District declined the Corps' offer. PSTA Ex. 19.

In the interim, on October 19, 2010, Dr. Jones made a presentation to the TOC summarizing the results of the PSTA demonstration project for the period February – September 2010. PSTA Ex. 9. However, support for the STA-1E project was nonexistent. The Department of Interior expressed to the Corps the view that the inflow concentrations for the PSTA demonstration cells were not "real-world inflow conditions"

and thus the data from the project had limited use and application "in evaluating the potential of full-scale PSTA systems to cost-effectively reduce P concentrations to desired levels."  PSTA Ex. 1 (Bush), p. 7.  And the District expressed the view that continuation of the PSTA project for another year would limit the operations of STA-1E. PSTA Ex. 1 (Bush), p. 8.  This was a position that the District had been maintaining for more than a year.  Tr. 157-58 (Bush).

With no support from the TOC (including the Corps's member on the TOC), the District, or EPA, the Corps believed "that it has no practical alternative but to decommission PSTA in STA-1E."  PSTA Ex. 1 (Bush), p. 9; Tr. 159-60.  On November 19, 2010, the Corps advised the Tribe that the project would be discontinued when the cooperative agreement expired on December 31, 2010.  PSTA Ex. 20.

On December 1, 2010, Dr. Jones received "unofficial" notice that the Corps had decided not to fund the project beyond December 31, 2010, when all sample collection was to cease.   On December 22, 2010, Dr. Jones received formal notice that the cooperative agreement under which the project had been operating would not be continued beyond December 31, 2010.  On December 27, 2010, Dr. Jones received notice that the ACOE would not be requiring a final report from him on the PSTA demonstration project.  PSTA 232 (Jones), p. 4.

Through the end of 2010, the Corps had expended between $13-15 million on its PSTA research projects, including the STA-1E PSTA cell.  PSTA Ex. 232 (Jones), p. 4; PSTA Ex. 1 (Bush), p. 4; Tr. 152-53 (Bush).

Mr. Bush defended the Corps' decision to terminate the PSTA project as "reasonable" because it spent $13 million to carry the project as far as it did and

continuing the project would not necessarily answer questions about long-term performance of PSTA; no other agency wanted to continue the project; and EPA contemplated the decommissioning of the project as part of its blueprint for compliance with its proposed WQBEL in its Amended Determination.  PSTA Ex. 1 (Bush), p. 10. Mr. Bush offered an additional reason: as long as the PSTA project remained in operation, the STA-1E would remain in "stabilization" as opposed to "routine operations" under its Everglades Forever Act Permit from the State of Florida.  *Id.*[10]

Dr. Jones estimated that $600,000 – $800,000 would "allow the collection of another year of data and completion of the project as originally planned."  PSTA Ex. 232 (Jones), p. 4.[11]  "This additional data along with the production of a meaningful final report would allow the scale up of PSTA and provide information necessary to implement this important Phase 2 technology into the other STAs."  *Id.*

However, without a funding sponsor, this won't happen.  The ACOE's current plans are to decommission the PSTA project in March 2011.  PSTA Ex. 1 (Bush), p. 10.[12]

Dr. Rice offered an opinion he has offered in the past: without additional technology within the STAs, the STAs will not be able to produce water of a quality that will achieve the Class III phosphorus numeric criterion in the receiving water bodies. PSTA Ex. 231 (Rice), p. 2-3.  Dr. Rice quoted from the 1997 ACOE permit authorizing construction of the initial STAs.  In Special Condition 7 to that permit, the Corps required investigation of treatment technologies to supplement STAs, including periphyton STAs.

---

[10] I explained in my January 4, 2011 Report (p. 23-25) the difference between stabilization and routine operation.

[11] This additional cost presumably does not include further data collection on Cell A since Dr. Jones testified that he and his project team had decided to take Cell A off-line "because we don't find it's functioning as well."  Tr. 45 (Jones).

[12] To maintain the viability of the PSTA cells, the Corps is working with the District to provide water to the PSTA cells until March 2011, to the extent that water is available.  PSTA Ex. 1 (Bush), p. 10.

*Id.*, p. 3-5.   Special Condition 5 to the permit required submissions by 2001 of the strategy that would be utilized to meet the phosphoric numeric water quality criterion.  *Id.* at 5-6.   Dr. Rice then cites to other documents emphasizing the importance of supplemental technologies if the Class III numeric criterion is to be achieved.  *Id.* at 6-7.

But Dr. Rice does acknowledge that a PSTA is not without its concerns when he compares a PSTA cell to an SAV cell within an STA:

> A Periphyton STA is a supplemental technology possessing its own pros and cons that also holds significant promise for achieving STA discharges of 10 ppb P. In my opinion, the PSTA has significantly more promise for success than SAV.

*Id.* at 8.   Nonetheless, Dr. Rice endorses both SAV and PSTA as candidates for a thorough evaluation and comparison and full-scale incorporation into the treatment-trains of STAs.  *Id.* at 10.

Dr. Rice believes that investing another $600,000 to complete the STA-1E project is a "good investment," and that it would be a "serious mistake" and "contrary to the research requirements of the Consent Decree" to decommission the project without "carrying the research to a logical conclusion so that a scientific report on the data can be produced that settles the issue of the effectiveness of this Phase II technology."  *Id.* at 9.

The District's witness, Dr. Goforth, gave testimony both on the District's research of STA technologies and specifically on periphyton.  I summarize this testimony below.

In 1992, the year that the Settlement Agreement was executed, the District began the research process by evaluating sixteen phosphorus-removal treatment technologies, including an "algal polishing cell," or what later became known as a PSTA cell. Eventually the District focused primarily on three technologies, including STAs, for further study.   PSTA Ex. 101 (Goforth), p. 2-3.   In 1996, after further research and

consultation with scientists familiar with phosphorus removal technologies, the District identified fourteen additional technologies, including PSTAs.  A workshop with representatives of the ACOE, the Florida Department of Environmental Protection (FDEP), the District, and experts from consulting firms evaluated the technologies and identified the top seven.  PSTA was not on the list then because it was at the time an unproven technology.  PSTA Ex. 101 (Goforth), p. 4-5.

In 1997 and 1998, the District began an investigation of the top five of these seven technologies.  It also began research on PSTA.  PSTA Ex. 101 (Goforth), p. 6. Peer review panels were established.  Standardized data collection and analysis occurred to allow for comparisons of each technology.  The results of this research program were reported in Everglades Consolidated Reports and South Florida Environmental Reports for 1999-2004. PSTA Ex. 101 (Goforth), p. 7.

The District incorporated the results of this research into the planning, design, and optimization of the STAs.  In 1998, SAV was incorporated into STA-1W Cell 5.   In 2000, Cells 1 and 2 of STA-3/4 were redesigned to incorporate interior dividing levees to segregate emergent vegetation in upstream cells from SAV in downstream cells. PSTA Ex. 101 (Goforth), p. 7-8.

This research was then incorporated into Basin-Specific Feasibility Studies for thirteen tributaries that discharge into the Everglades Protection Area. PSTA Ex. 101 (Goforth), p. 8.  PSTA was one of the treatment technologies identified for each tributary along with Best Management Practices (BMPs) and STAs.  *Id.*

In 2003, the Long Term Plan[13] identified STA-enhancement activities, which included further investigation of SAV and PSTA.  PSTA Ex. 101 (Goforth), p. 9.

Focusing only on PSTA, Dr. Goforth explained that periphyton is a naturally occurring component in the STAs.  PSTA Ex. 101 (Goforth), p. 10.  The District has been investigating its use since 1991.  The results of the District's PSTA research have been documented in Everglades reports from 1999-2010. PSTA Ex. 101 (Goforth), p. 13, 40-42.  As of 2003, the District "and other agencies" had spent $12 million investigating PSTA. PSTA Ex. 101 (Goforth), p. 13-14.

As for specific projects, Dr. Goforth described three projects conducted between 1998 and 2005.  The first one involved twenty-four "bathtub-sized" mesocosms to evaluate various substrates.  These mesocosms were operated for 12 months and evaluated based on the phosphorus outflow concentrations. PSTA Ex. 101 (Goforth), p. 14.

PSTA performance was also evaluated in "raceways," which were 44 meters long and .3 meters wide.  They contained a limerock substrate with a limerock berm midway through the raceway.  Over a 19-month period, the mean outflow phosphorus concentration for water routed through these raceways was 10 ppb. PSTA Ex. 101 (Goforth), p. 14.

Three test cells in STA-1W, each about .5 acres in size, were devoted to PSTA research between 1999 and 2005.  Each cell had a different substrate.  Again the outflow

---

[13] The Long Term Plan formally is entitled, "Final Report, Everglades Protection Area Tributary Basins, Long Term Plan for Achieving Water Quality Goals."  It is dated October 27, 2003 and is updated periodically.  It updates a March 17, 2003 document entitled, "Everglades Protection Area Tributary Basins, Conceptual Plan for Achieving Long-Term Water Quality Goals."  The Long Term Plan was written into the 2003 amendments to the Everglades Forever Act.  Section 373.4592(3)(b).

concentrations were evaluated and compared based on the type of substrate utilized. PSTA Ex. 101 (Goforth), p. 15.

In 2000-2003, the District then conducted two field scale PSTA projects.  In Cell 3 of STA-2, a ten-acre limerock pad was constructed and then monitored for algal and diatom growth.  PSTA Ex. 101 (Goforth), p. 16.  In addition, four five-acre test cells were constructed adjacent to Cell 3 of STA-2, again to evaluate different substrates.  Two of the cells featured two feet of limerock over native peat, and one of these two featured an internal levee that tripled the length of the treatment flow path.  In a third cell, the native peat was scraped down to bedrock.  In the fourth cell, peat was exposed to the water column as a control cell.  Treatment performance was measured from 2001-2003, again by evaluating the phosphorus outflow concentrations. PSTA Ex. 101 (Goforth), p. 16-17.

In July 2003, the District hosted a workshop to develop a conceptual plan for a large-scale PSTA project in STA-3/4.  The ACOE, Audubon of Florida, and FDEP were among the participants.  Gaining a better understanding of construction and operation costs and the sustainability of phosphorus removal performance at "full-scale flows and nutrient loading" were among the goals of this project.  The PSTA project resulting from this workshop consisted of 400 acres.  There was a 200-acre upstream SAV cell followed by side-by-side PSTA cell (100 acres) and SAV cell (100 acres).  In the PSTA cell in this project, the District removed the native soil down to the limestone substrate. Construction was completed in 2005 at a cost of approximately $3.4 million. PSTA Ex. 101 (Goforth), p. 18-19.

Operation of this PSTA project began in 2006 but was interrupted by drought conditions in 2006-07.  For Water Years 2008-2010 (May 1, 2007 – April 30, 2010), Dr.

Goforth reports that the PSTA cell discharged water at a three-year flow-weighted mean phosphorus concentration of 10 ppb.  The inflow concentrations ranged from 14 to 28 ppb, with a three-year flow weighted mean of 20 ppb. PSTA Ex. 101 (Goforth), p.21.

Over time, SAV has colonized the PSTA cell in STA-3/4 although there remains a healthy population of periphyton.[14]  In Water Year 2009, this cell discharged water with a flow weighted mean phosphorus concentration of 8 ppb and, as noted above, a three-year flow-weighted mean concentration of 10 ppb.  No SAV cell resting over a peat substrate in any STA has matched this performance. Dr. Goforth attributes this success to the limestone substrate which would not release phosphorus back into the water column as would occur with a peat substrate.  PSTA Ex. 101 (Goforth), p. 22; Tr. 195 (Goforth).[15]

There remain uncertainties about the results of this project, however.  The outflow water volume was higher than the inflow water volume, for example, for reasons not yet fully understood.  The inflow volumes were not "pulsed" the way that water is pulsed for other treatment cells and so extrapolation of both outflow concentrations and the "net settling rates" to full pulsed conditions may not be accurate.   Operating depths and seepage are other issues that the District is still trying to understand better.  PSTA Ex. 101 (Goforth), p. 23.

I mentioned "net settling rates" above.  The settling rate, which is expressed in "meters per year" or "m/yr," refers to the amount of phosphorus retained within the

---

[14] SAV has also moved into Cell C in the PSTA demonstration cell in STA-1E.  Tr. 125 (Jones), 134 (Jones).

[15] Dr. Goforth agreed with Dr. Jones' discussion of the dynamics of soil accretion in an STA, but also explained that while accretion of soils in the STA-3/4 PSTA cell will have more organic soil than what might be found in natural conditions in Everglades National Park, it would have less organic content than would occur in a typical SAV cell that was not grown over a limestone substrate.  Tr. 181-82 (Goforth).

STA.[16]  The greater the settling rate, the more effective is the treatment that occurs within the STA.  And the greater the settling rate, the less acreage needed for an STA.  Tr. 47 (Jones).  Dr. Jones said that he was confident based on the settling rate data that he had already that he could calculate the STA acreage needed for a PSTA cell.  Tr. 69-70 (Jones).

In the TOC meeting of October 2010, there was a slide presentation made by the TOC's representative from the Refuge on, among other things, the cost-effectiveness of PSTA based on available data from the ACOE's STA-1E PSTA cells.  PSTA Ex. 21.[17] That presentation took into account data through July 2010.  *Id.*  The net settling rate used in the presentation was 8 m/yr.  When converted to the number of acres required for a full scale PSTA, this low settling rate produces a large number of acres.   Since land availability is not high, the more acres needed for a particular type of STA to be effective, the less attractive is that type of STA.

Dr. Goforth used data through October 2010 from the PSTA demonstration project to calculate an updated settlement rate.  He also used data from 2008 when the PSTA demonstration cells operated for about three months.  Based on this data, he calculated a net settling rate of 22 m/yr for the STA-1E PSTA project based on Cell A's performance, instead of 8 m/yr that was derived from data through July 2010.  As a

---

[16]  In layperson-like terms, this exchange also explains the settling rate: "THE SPECIAL MASTER:  Essentially, you are trying to figure out if this is the phosphorus -- you are looking at what's coming in, what's going out and basically trying to calculate where everything else went. THE WITNESS:  That's exactly right."  Tr. 222 (Goforth).

[17]  The Refuge representative's presentation also identified the low inflow concentration and less than optimal hydraulic loading and raised a question about whether one could scale up to a full-sized STA from the data generated through July 2010.  Among his conclusions were:  "The demo project has lasted seven years, and produced one year of data"; "Outlet concentrations were often less than 10 ppb; inlet concentrations were about 12 ppb"; "Removals were negative in one of six datasets"; and "Removals were statistically insignificant in four of six datasets."

result, Dr. Goforth agreed that, because of the amount of data then available, the TOC did

not receive the most updated status of the PSTA cell's performance:

> THE SPECIAL MASTER:  Dr. Goforth, react to this for
> me.  I just -- did the TOC get a fair picture of the PSTA
> cell's performance?  Listening I am thinking to myself...
>
> THE WITNESS:  No, I don't think they did.
>
> THE SPECIAL MASTER:  It doesn't sound like they got a
> fair picture of the data.
>
> THE WITNESS:  Not that it was intentional.
>
> THE SPECIAL MASTER:   I am not trying to be
> critical.  It just seems to me listening to you that they took
> information that in broader terms presents a slightly
> different picture, frankly.
>
> THE WITNESS:  I agree.

Tr. p. 168 (Goforth).[18]

Dr. Goforth's analysis also demonstrated that the field-scale PSTA project in

STA-3/4 had a net settling rate of 31 m/yr with roughly the same phosphorus loading rate

that existed in Cell C of the STA-1E PSTA demonstration project.  PSTA Ex. 135, p. 13;

PSTA Ex. 101 (Goforth), p. 34; Tr. 172 (Goforth).

---

[18]  As noted above, Cell A's settling rate was the source of the figure of 22 m/yr.  Dr. Jones
testified that Cell A was going to be abandoned if the PSTA demonstration project was to be
continued.  Tr. 45 (Jones).  Cell B's settling rate was 2.1 m/yr and Cell C's settling rate was 8.3
m/yr based on data through October 2010.  PSTA Ex. 101 (Goforth), p. 28; Tr. 217 (Goforth).
Both of these figures are within the range of the figures used at the October 2010 TOC meeting
based on data through July 2010.  When asked later whether he would use Cell C instead of Cell
A to determine settling rates from the PSTA STA-1E project because Cell A was going to be
abandoned, Dr. Goforth responded:  "A.  You know, to be honest with you, I don't like to kind of
toss out data without fully understanding the reasons behind that.  I would like to sit down with
Dr. Jones to understand why they abandoned. I did hear his testimony regarding the thin nature of
the soil, the fine quality, the fact that you had emergent vegetation coming into that cell.  Those
are important factors.   I want to understand that.   If indeed that one is removed from
consideration then we'd look at Cell C which would be the higher settling rate of the two.  Q.  So,
in other words, you would like to make sure there is a scientifically valid reason for abandoning
Cell A?  A.  That's correct."  Tr. 217-18 (Goforth).

Dr. Goforth looked at the data from all of the District's PSTA projects identified above and compared them to the STA-1E PSTA cells' performance and concluded that there was no need to continue the STA-1E demonstration project because the data were all reasonably consistent:

> To be honest, I don't expect to see a lot of surprises if this project is continued. I think the data have in many ways stabilized and since the performance indicators kind of fall within the clouds, within the performance envelope of the other PSTA project[s], in fact, if we look at those exhibits that we just talked about those figures, Figure 7 in Exhibit 135 and Figure 8, that's what I referred to as rather the performance envelope.
>
> ***
>
> The point is, the STA-1E PSTA, this is a good example, on Figure 8, the STA-1E PSTA performance kind of falls right on that line, not at the boundary but it's kind of within the cloud of performance from the other PSTA platforms. Given what I have seen and the 12 months of data that [I] have analyzed from STA-1E, I would be surprised if additional years of [] data would substantially change these performance estimates.

Tr. 176, 178 (Goforth).

Dr. Goforth and Dr. Jones also both agreed on the utility of the approaches taken in Cell C of the STA-1E PSTA project and the PSTA Cell in STA-3/4:

> In paragraph 20 Dr. Jones states, "It appears that both of these technologies," that would be the scrape down and the laying down of the limerock substrata, "have legitimate applications within the overall effort to limit the cultural eutrophication of the Everglades driven by phosphorus-laden stormwater runoff." Do you agree or disagree with Dr. Jones' statement?
>
> A.   I endorse that statement. I think there is a proper application for both (types) of PSTA cell depending on the site specific conditions you have to deal with.

Tr. 183-84 (Goforth).[19]

Dr. Goforth then explained what conditions might justify the use of one approach over the other and agreed with Dr. Jones that there was enough data that have already been compiled to allow PSTA technology to be evaluated for use in existing or new STAs:

> Based upon what you have seen in the studies and the data so far, when is one appropriate and one not?
>
> A.    Okay.  In an area such that you have a rather thin organic layer and by thin it might be in the order of two feet or less, the economics work out that it might be less expensive to scrape away the organic soil as it would be to haul in imported substrate.  Again, site specific features, you know, two feet may not be a common universal depth. It depends how close you are to a core and things like that. But I think in general if you have a thin core organic [soil], it may be more advantageous to use the technology such as we did in STA-3/4 where we just went in and scraped down the soil, down to the limestone cap rock, expose that calcium rich substrate, which I think is very important.
>
> On the other hand, if you have a very thick soil, it would probably be advantageous to have an import of the calcium rich substrate as opposed to scraping down, three, four, five, six feet of organic material.  That's just a general concept.  It may be that you have a situation where you do both. In other words, if you have got a very thick soil but you have a high ground elevation subject to dry-out, it may be that you really want to perhaps scrape down one foot to kind of have a low area in your topography to serve during dry weather, that's where the water would accumulate, but then actually bring in maybe six inches of limerock on top of that.    That, in essence, may be a hybrid of the technologies we use in STA-3/4 and STA-1E.
>
> So, site specific conditions would dictate which application and which features.  Your request, do we need more data to

---

[19] Dr. Goforth later added: "Q. All right.  Then I think I understood you to say that you believe that both the Corps' project and the District's project have potentially useful applications throughout the Everglades.  Is that fair?  A. Or throughout the upstream areas, upstream of the Everglades.  Q. Within the treatment areas?  A. Yes, that is fair." Tr. 196-97 (Goforth)

> help in that?  Well, it's something to say as an engineer or
> scientist, yes, it would be nice to have more data to tighten
> down the confidence.  It's tempting[;] however, looking at
> the years of data that we have on different PSTA projects, I
> think we have sufficient information to move forward.

Tr. 184-86 (Goforth).

Dr. Goforth then clarified that there remain questions regarding how the STA-1E

PSTA technology would perform at higher inflow concentrations, among other things,

but said he was not "necessarily sure extending this project another 12 or 13 months will

fill in that data set."  Tr. 187 (Goforth).  But when asked whether periphyton will play a

big role in STAs of the future, his answer was unequivocal: "Absolutely."  *Id.*[20]

Dr. Goforth then agreed with Dr. Jones again that there was enough information

to move forward:

> THE WITNESS: … Moving to the next step, and I think
> we heard Dr. Jones indicate this and I totally support it, but
> the next step would be [a] feasibility study to integrate the
> phosphorus performance that has been exhibited in STA-
> 1E, STA-3/4, in the five acre test cells, integrate those
> PSTA performance characteristics in a feasibility study and
> that's the next step.
>
> THE SPECIAL MASTER:  Is there enough data to do that?
>
> THE WITNESS:  I think so.

Tr. 187-88 (Goforth).  Dr. Goforth was asked to repeat his views under cross-examination

and did so:

> A.     Let me answer very clearly.  No.   I think it's
> absolutely appropriate to do a feasibility study based on the
> information we have today.

---

[20] He repeated this answer later in cross examination: "Q. I think in response to the Special
Master's question you indicated that it's your view that PSTA is a very important technology if
our goal is to achieve water quality standards?  A. Certainly the periphyton is, absolutely.  Q.
The periphyton.  Would your view be that SAV alone without periphyton is not able to get down
to levels as low as can be achieved with SAV and PSTA?  A. That's what I said, that's correct."
Tr. 196 (Goforth)

> Q.  About PSTA?
>
> A.  Well, about PSTA, as well as SAV as well as any of the treatment trains that we have been looking at, yes.
>
> Q.  You also said on the other hand that you don't know whether -- how PSTA, the Corps's PSTA project will react to higher phosphorus concentration inflows.  Is that fair?
>
> A.  Yes, that's correct.
>
> Q.  Isn't it possible that the collection of additional data would allow us to asses that?
>
> A.  As I mention, it's tempting to say, yes, let's run it for another year, another two years, another two years.  You know, it's tempting to say that but the data that I have evaluated kind of fits within the cloud of performance data from other PSTA platforms and I don't necessarily think it's necessary to begin [a] feasibility study after additional data is collected.  I think we have sufficient data now.

Tr. 197-98 (Goforth).[21]

In response to other questions on cross examination, Dr. Goforth said that the District is continuing to collect data in its PSTA Cell in STA-3/4 and Dr. Goforth has not recommended that this project be discontinued because there was already enough data. Tr. 199 (Goforth).  When asked if the STA-3/4 project was discontinued whether the District could still proceed with a feasibility study, Dr. Goforth said "yes":

> A.  I think we can proceed with the feasibility study based on the data set that we have, yes, sir.

Tr. 200 (Goforth).[22]

---

[21] Dr. Goforth later explained that the construction associated with the PSTA cell and a related SAV cell did create constraints on the amount of water that could be pushed through this part of STA-1E from the original design of 800 cubic feet per second: "Well, it was constructed by the Corps.  It was retrofitted for the PSTA project and that retrofit, there was installation[] of structures in between Cell 1 and Cell 2 that were not designed originally and those prevent the full 800 CFS from moving through the project."  Tr. 229 (Goforth).

[22] To be fair to Dr. Goforth, he had no opinion on whether the PSTA STA-1E project should be continued.  Tr. 237-38 (Goforth).  His view, as expressed above, is that there is sufficient data already generated by the STA-1E PSTA project and the data generated are consistent with other

## Tribe's Contentions

The Tribe has carefully crafted its argument to attempt to convince the Court that the Court must, under the terms of the Consent Decree, order the District or the United States to keep the STA-1E PSTA project going.  The Tribe starts with the premise that the purpose of the Settlement Agreement is to achieve the Class III numeric criterion in the Refuge and the Park.  Tribe's Notice of Contentions, p. 1.  It cites Paragraph 11 of the Settlement Agreement for the propositions that research had to be conducted to:

(a) generate the numeric interpretation of the narrative Class III standard;

(b) assess the responses of the Everglades Protection Area to nutrient input levels achieved by meeting interim and long-term limits and levels; and

(c) evaluate the performance of STAs and BMPs to meet the intent of the Settlement Agreement.  Settlement Agreement, p. 16-17; Tribe's Notice of Contentions, p. 2-3.

Appendix C to the Settlement Agreement is then cited by the Tribe for the proposition that the results of the research program would be incorporated into the control programs implemented under the Settlement Agreement to ensure that Class III criteria are met.  Specifically, the Settlement Agreement provides:

> **Control Program to Achieve Compliance with Class III Criteria**
>
> The research program will provide additional data to support the interpretation of Class III water quality criteria for the Refuge, Park, and the WCA's. Modification of the control program to achieve Class III criteria will reflect new information obtained in the research program and observed performance of the BMP's and STA's in the interim phase of the control program.

---

PSTA project data that it made sense now to go forward to a feasibility study rather than take more time to collect more data.

Settlement Agreement, p. C-6.

The Tribe then quotes from Appendix D, which is titled, "Research and Monitoring Program." Specifically at page D-1, the Tribe states, the Settlement Agreement provides:

> The State Parties shall primarily be responsible for the research and monitoring program with support from the United States. The National Park Service, the U.S. Fish and Wildlife Service, the USEPA and the Corps will assist in the research and monitoring. For example, funds available under Section 319 of the Clean Water Act can be granted to the State Parties by USEPA in support of approved monitoring programs to assess effectiveness of BMPs and STAs.

Based on these provisions, the Tribe argues that the Settlement Agreement "obligates both the State Parties and the United States to conduct that research which is necessary to ensure compliance with the Agreement; i.e., achievement of the Class III criteria. The control program must then be modified based upon the results of this research to ensure achievement of the criteria." Tribe's Notice of Contentions, p. 4.

The Tribe then argues that BMPs and STAs will not achieve the Class III criteria without implementation of additional polishing, or "Phase II," technologies. The Tribe contends that the PSTA project in STA-1E is the only research project being conducted by anyone which has the potential to satisfy the Class III numeric phosphorus criterion:

> The Tribe maintains that the Corps' Periphyton Stormwater Treatment Area (PSTA) project is the only Phase II research project being conducted by either the State Parties or the United States which has the potential to achieve the Class III criteria throughout the Everglades. This multi-phase project was commenced in 1999. The Corps has spent some $12 to $16 million since that time on the project. The PSTA project is in its third and final full field scale demonstration phase. The preliminary results from the field scale demonstration show that the PSTA program is achieving discharges ranging between 2 (ppb) and 6

> (ppb).   The PSTA project would be concluded in approximately one year at a cost of approximately $600,000.  The Tribe maintains that the PSTA technology may then be promptly and cost-effectively incorporated into the existing STAs to secure achievement of the Class III criteria.

Tribe's Notice of Contentions, p. 4.

The Tribe then argues that the Corps's decision to terminate the PSTA project is not only "a colossal waste of resources," Tribe's Notice of Contentions, p. 5,[23] but also amounts to a violation of the United States' obligation to support the State Parties' research obligations.

The Tribe also claims that the District's failure to take over the PSTA project in STA-1E "constitutes a violation of its own obligation to conduct that research which is necessary to achieve the Class III criteria."  Tribe's Notice of Contentions, p. 5.

With respect to the District's PSTA research, the Tribe argues that the PSTA cell in STA-3/4 is a "disguised submerged aquatic vegetation (SAV) program and that the results of the program to date suggest that SAV technology will not achieve the Class III criterion throughout the Everglades."  *Id.*  Again, the Tribe concludes, "Thus, the District and the United States are in violation of the Consent Decree by discontinuing the only Phase II Research project which will secure achievement of Class III criteria throughout the Everglades."  *Id.*

The Tribe's final argument is that the Settlement Agreement requires the State Parties and the United States "to take reasonable actions to achieve the purpose of the Agreement."   The Tribe says it is unreasonable "to abandon a vitally important and promising research project, on which millions have been spent, and which can be

---

[23] The Corps obviously disagrees with this assertion.

completed in a short time and for a reasonable sum."[24]   The Court, in the view of the Tribe, "has an obligation to require the parties to effectuate the Settlement Agreement without wasting precious taxpayer dollars."  *Id.*

## Analysis

In strict legal terms, there is no text within the Settlement Agreement that requires the District or the United States[25] to continue the STA-1E PSTA project.  None of the Settlement Agreement language cited by the Tribe tells the State Parties that they must take over the project that came to its contractual end on December 31, 2010.

Appendix D sets forth the definitive requirements for "Research and Monitoring Programs" under the Settlement Agreement.  It requires the State Parties to "initiate a comprehensive, long-term, multi-agency cooperative research and monitoring program," which is implemented "according to a schedule established by the TOC."  The State Parties are "primarily responsible" for the research program "with support from the United States."  Settlement Agreement, p. D-1.

The objectives of the research are "to assess the current and continuing responses of the Everglades wetlands to nutrient inputs from cultural eutrophication, and to determine maximum levels of nutrients that will not cause imbalances in the natural populations of aquatic flora and fauna."  *Id.*

---

[24] The Tribe adds that "it appears" that the STA-1E PSTA project "is being abandoned because of the disagreement between the Corps and the District as to which of them is most responsible for the poor performance of STA1E." Tribe's Notice of Contentions, p. 5. From the witness testimony that I heard and the documents I reviewed, this belief is not sustained by the record.
[25] The United States points out that the Tribe never included in any motion before the Court that the United States (as opposed to the State Parties) should carry on the STA-1E PSTA project. Tr. 261 (Geldermann).  I agree that the Tribe's initial motion [D.E. 2087] did not cover the United States and that may well be grounds enough to deny the Tribe's motion as to the United States. But since the record has been made, for completeness, I address the merits of the Tribe's motion both as to the United States and the District.

To meet these objectives, the research program is to have "the following minimum components":

1.  Collection of appropriate data for, and completion of, "detailed modeling efforts to measure quality and quantity impacts of system operation and alternatives for the purpose of improving water quality in the Everglades system." Modeling is to incorporate "the best available scientific information on nutrient dynamics (including peat accretion rates; soil uptake kinetics; macrophyte and periphyton uptake kinetics; and total phosphorus transport mechanisms, including storage and transport in shallow seepage) to determine the fate of introduced nutrients and trends." Models for STAs were also to be prepared. "Each model shall be designed to predict changes in outflow water quality and quantity in the WCAs and to predict and assess the long-term success of nutrient management strategies in achieving water quality criteria."

2.  Determination of existing conditions in the Refuge and Park marshes and whether additional damage in either "has occurred due to interim delivery levels of total phosphorus or if reversals of damage are evident."

3.  Development of a program "that will include experimental approaches to interpret the Class III nutrient criterion" and determining if "concentration standards provide sufficient protection against imbalances or whether limitations on phosphorus loads into the Park and Refuge are required." "An array of indices will be used to measure sensitivity of the ecosystem to small changes in nutrients. These will include nutrient cycling processes and the basic components of the Everglades ecosystem, such as periphyton, and other sensitive indicators of nutrient enrichment."

4.  If land is available, development and initiation of research "to measure performance and improve field efficiency of BMPs."

Settlement Agreement, p. D-2 – D-3. This text does not require the District or the United States to continue the STA-1E PSTA project.

The Tribe's argument that the STA-1E PSTA project must be continued because it offers the only hope of meeting the Class III criterion in the Refuge and the Park fails for several reasons:

1.  The Consent Decree does not require the State Parties to employ a particular type of STA.  It requires satisfaction of the long-term levels but leaves the mechanisms to achieve this goal to the State Parties.

2.  The testimony produced a consensus that periphyton plays a role now in STAs and will play a role in future STAs or in retrofitting existing STAs. Both Dr. Jones and Dr. Goforth testified that the data are already sufficient to move to the next phase of planning, a feasibility study and, in their judgment, there is no scientific reason to collect more data in this particular project.

3.  Based on the evidence presented, I have no confidence that continuing the STA-1E PSTA cells would generate any better data than already exists. Getting enough water to the PSTA cells in STA-1E at high enough phosphorus concentrations has proven to be a challenge to date and I was not persuaded by the witnesses for the Tribe that the dataset a year from now would be an improvement over the dataset that now exists.

4.  I was persuaded by Dr. Goforth's testimony, and in particular, the figures in his report that compared the results from the District's PSTA research and the STA-1E PSTA cell project that showed that periphyton can be effective as a polishing step to reduce phosphorus outflow concentrations to below 10 ppb depending upon the use of the proper substrate relative to

the soil depth and the topography of an STA, and based on achieving inflow concentrations that will not overwhelm the periphyton mat.

The record also supports the positions of the United States and the District that they have satisfied and are satisfying the research requirements of the Settlement Agreement. The United States, through the ACOE, has been doing PSTA research for more than ten years. The District has been conducting research for an even longer period of time on the role that periphyton can play in the phosphorus removal treatment train of an STA. More than $20 million has been spent collectively by these parties on PSTA-related research since the Consent Decree was entered.

I do not regard the work performed by the ACOE or Dr. Jones to date as a "colossal waste of resources." The research conducted by the Corps and Dr. Jones at the Flying Cow facility and in STA-1E has generated very useful information on the benefits of periphyton and provided important data on settling rates and optimal substrates for periphyton use. To be sure, more work needs to be done on design parameters, but Dr. Goforth's figures show that all of the PSTA research to date conducted by the ACOE and the District, produced, generally, the same range of results, and there is enough information today to evaluate the feasibility of implementing PSTA versus other treatment technologies taking into account topography and soil conditions on land available for use as an STA or within existing STAs.

Because I also was not persuaded that spending more money and time on the STA-1E PSTA cell would generate any better data than now exists (because of the difficulty of increasing the inflow concentration and doubts I have about water availability and water flow capabilities of the STA-1E structures), it is more likely that it

would be a waste of resources to continue the project and lose another year or more of time to evaluate periphyton as part of a feasibility study of properly-sized treatment technologies for additional or reconfigured STAs.

## Conclusion

To summarize, where

(1)  no provision in the Consent Decree requires that the particular project being conducted in the STA-1E PSTA cell be continued,

(2)  the United States and the District are satisfying the research requirements of the Consent Decree by having conducted an enormous amount of PSTA research within the past fifteen years at the laboratory level, pilot level, and full field scale level (involving hundreds of acres in total and jointly more than $20 million),

(3)  the parties who established the research requirements in the Settlement Agreement are in accord on discontinuing the STA-1E PSTA cell project,

(4)  the TOC does not endorse its continuation,

(5)  the Environmental Protection Agency envisioned its decommissioning and also emphasized the importance of curing the construction defects in STA-1E and making the entire STA-1E complex available for stormwater treatment as soon as practicable,

(6)  Dr. Jones and Dr. Goforth agree that there are enough data already to justify the use of periphyton in the right conditions within an STA,

(7)  the evidence left me with severe reservations that scientists will learn much more than they already know by continuing the STA-1E PSTA project and with the fear that waiting another year or longer to gather more data might actually interfere with the active consideration of PSTA in feasibility studies for future STAs or delay completion of feasibility studies,

and for the other reasons set forth above, I cannot recommend, and do not recommend, that the Court step in and overrule all of the State and Federal agencies involved and direct the District or the United States to continue the STA-1E PSTA demonstration project.

Respectfully Submitted,


/s/ John M. Barkett
JOHN M. BARKETT
Special Master
February 11, 2011

cc:  Copies to Parties via email on the attached service list

## United States v. South Florida Water Management District Service List

| Counsel | Representing |
|---|---|
| Norman Hemming, Esq. | United States of America |

Norman Hemming, Esq.
United States Attorney's Office
99 N.E. 4th Street, 3rd Floor
Miami, FL  33132
Telephone: 305-961-9000
Facsimile: 305-530-7139

Keith Saxe, Esq.                                         United States of America
Edward S. Geldermann, Esq.
Anna K. Stimmel, Esq.
United States Department of Justice
Environmental and Natural Resource Division
PO Box 663 – Ben Franklin Station
Washington, DC  20044
Telephone: 202-305-0242
Facsimile: 202-305-0506

Thomas M. Beason, Esq.                             State of Florida
David A. Crowley, Esq.
Kenneth B. Hayman, Esq.
Office of General Counsel
Florida Department of Environmental Protection
Marjory Stoneman Douglas Building
3900 Commonwealth Blvd., M.S. 35
Tallahassee, FL  32399-3000
Telephone: 850-245-2295
Facsimile: 850-245-2147

Charles A. De Monaco, Esq.                        State of Florida
Stephanie Schmidt, Esq.
Fox Rothchild LLP
625 Liberty Avenue
Pittsburgh, PA  15222
Telephone: 412-391-1334
Facsimile: 412-391-6984

Parker D. Thomson, Esq.                             State of Florida
Joanne Rotondi, Esq.
James T. Banks, Esq.
Hogan Lovells US LLP
Mellon Financial Center – 19th Floor
1111 Brickell Avenue
Miami, FL  33131
Telephone: 305-459-6500
Facsimile: 305-459-6550

Kirk L. Burns, Esq.                                       South Florida Water Management District
Keith W. Rizzardi, Esq.
South Florida Water Management District
3301 Gun Club Road, MSC  1410
West Palm Beach, FL   33406
Telephone: 561-682-2153 (Mr. MacLaughlin)
Telephone 561)682-6546 (Mr. Burns)
Facsimile: 561-682-6276

Enrique D. Arana, Esq.                               Miccosukee Tribe of Indians of Florida
Sonia Escobio O'Donnell, Esq.
Scott E. Byers, Esq.
Jorden Burt LLP
777 Brickell Ave., Suite 500
Miami, FL   33131
Telephone: 305-370-2600
Facsimile: 305-372-9928

E. Thom Rumberger, Esq.                           Florida Audubon Society
Anna H. Upton, Esq.
Rumberger, Kirk & Caldwell, P.A.
PO Box 10507
Tallahassee, FL 32303-2507 (for mail)
215 South Monroe Street, Suite 130
Tallahassee, FL  32301
Telephone:  850-222-6550
Facsimile: 850-222-8783

David G. Guest, Esq.                               Florida Wildlife Federation
Alisa Coe, Esq.                                     Florida Chapter Sierra Club
Monica Reimer, Esq.                            National Wildlife Federation
Earthjustice                                     Florida Wildlife Federation
PO Box 1329                                 National Parks and Conservation Association
Tallahassee, FL   32302-1329              Defenders of Wildlife
Telephone: 850-681-0031                 Audubon Society of the Everglades
Facsimile: 850-681-0020

Gary V. Perko, Esq.                            Western Palm Beach County Farm Bureau
Hopping Green & Sams, P.A.             Roth Farms, Inc.
119 S. Monroe Street, Suite 300         K.W.B. Farms
Tallahassee, FL  32301
Telephone: 850-222-7500
Facsimile: 850-224-8551

Joseph P. Klock, Jr., Esq.                   Roth Farms, Inc.
Gabriel E. Nieto, Esq.
Matthew P. Coglianese, Esq.
Rasco Klock Reininger Perez Esquenazi Vigil & Nieto
283 Catalonia Avenue, Second Floor
Coral Gables, FL  33134
Telephone: 305-476-7100
Facsimile: 305-476-7102

Rick J. Burgess, Esq.                         United States Sugar Corporation
Luna Ergas Phillips, Esq.
Gunster, Yoakley & Stewart, P.A.
450 East Broward Blvd., Suite 1400
Ft. Lauderdale, FL  33301-4206
Telephone: 954-462-2000
Facsimile: 954-523-1722