UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
Miami Division

### Case Number: 88-1886-CIV-MORENO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.

SOUTH FLORIDA WATER MANAGEMENT
DISTRICT, *et. al.*,

      Defendants.

_____/

## **ORDER AFFIRMING THE SPECIAL MASTER'S JANUARY 4, 2011 REPORT**

On March 31, 2010, the Court entered an Order referring a number of issues to the Special

Master. The following issues were referred for the Special Master's review:

- Compliance with the Consent Decree's Load Reduction Requirements

- Whether the phosphorus exceedances in the Everglades Protection Area constitute a violation of Appendix A of the Consent Decree

- Whether discharges into the Western Basins constitute a violation of the Consent Decree

- Whether the Consent Decree requires that phosphorus discharges be limited to "10 ppb Everglades-wide" as opposed to the "17 ppb goal"

- Recommendations regarding the admitted violation of the long term level in the Loxahatchee Refuge

The Special Master also considered the United States' Motion for Resolution of Liability

Issues filed on July 15, 2010, which he viewed as overlapping to the issues referred to him by the

Court. The Special Master conducted a five day evidentiary hearing and considered the testimony

of nineteen expert witnesses. All the parties, the State Parties, the United States, the Tribe, the

environmental groups and the Farm Interests participated in the evidentiary hearing.  The Special

Master prepared a 158-page report thoroughly analyzing these issues.  The State Parties have moved

the Court adopt the Report in its entirety.  The United States has moved to adopt it in part.

After reviewing the Report, the Court overrules the objections and adopts the January 4, 2011

Report.  Accordingly, it is

ADJUDGED that the State Parties' Motion to Adopt the Report of the Special Master **(D.E.**

**No. 2245)** filed on **February 11, 2011** is GRANTED and the United States' Motion to Adopt in Part

the Report of the Special Master **(D.E. No. 2244)** filed on **February 11, 2011** is GRANTED in part.

It is also

ADJUDGED that the United States' Motion for Resolution of Liability Issues **(D.E. No.**

**2179)** filed on **July 15, 2010** is DENIED without prejudice. It is also

ADJUDGED that the Miccosukee Tribe of Indians' Motion Seeking a Declaration of

Violations **(D.E. No. 2087)** filed on **October 15, 2009** is DENIED in part and GRANTED in part

consistent with this Order.

## I. BACKGROUND

### *Summary of the Special Master's January 4, 2011 Report*

On January 4, 2011, the Special Master filed a Report addressing the issues referred by the

Court in its March 31, 2010 Order as well as the issues presented in the United States' Motion for

Resolution of Liability Issues.

The goal of the Consent Decree is to reduce the levels of phosphorus in the water traveling

through the Everglades. One source of phosphorus emphasized by the Special Master is the fertilizer

used by the sugar farmers in the Everglades Agricultural Area ("EAA").  When the storm-water

leaves the farms, it carries the phosphorus to the rest of the Everglades.  Phosphorus, a nutrient, causes an imbalance in the natural flora.  This problem was the impetus for this suit.  And, the level of phosphorus in storm-water continues to be at issue in this litigation.  The parties dispute the appropriate levels under the Consent Decree in the Everglades.  They also dispute whether certain areas, including certain Water Conservation Areas, are encompassed in the scope of the Consent Decree.

Under Florida's "Phosphorus Rule," compliance is not measured by the concentration in water coming "out of the pipe" but rather by water quality within the Everglades Protection Area ("EPA") based on sample results from networks of sampling locations.  Because water quality can vary over a given area over periods of time, compliance with the numeric phosphorus criterion is evaluated by accounting for both "spatial" and "temporal" variability in phosphorus concentrations. The State of Florida sets water quality standards and in 2004 enacted the Phosphorus Rule, § 62-302.540(4)(d)(1), F.A.C..  The United States Environmental Protection Agency ("U.S.E.P.A.") is required to approve a state's change in water quality standards, unless the state's standards are inconsistent with the Clean Water Act. 33 U.S.C. § 1313(c)(3).  The U.S.E.P.A. approved the State of Florida's 2004 enactment of the Phosphorus Rule in a Determination dated July 27, 2005, May 8, 2006, and finally May 31, 2006 as explained by Judge Gold in *Miccosukee Tribe v. United States*, Case No. 04-21448-CIV-GOLD, 2008 WL 2967654, *26, n.44 (S.D. Fla. July 29, 2008).

### A. Discussion of Miccosukee Tribe v. United States (Judge Gold's Case)

The Special Master examined Judge Gold's case, which addresses a Clean Water Act challenge to the propriety of U.S.E.P.A.'s Determination accepting Florida's four-part criteria for

measuring phosphorus. Judge Gold initially found that contrary to the U.S.E.P.A.'s Determination, two sections of the Phosphorus Rule were changes in water quality standards that violated the Clean Water Act because they delayed until 2016 compliance with the phosphorus numeric criterion. *Miccosukee Tribe*, 2008 WL 2967654 at *27-28, 32-33. In response the Florida Department of Environmental Protection implemented a permitting approach in phases to coincide with the District's obligations. The phases, Start-Up, Stabilization, and Post-Stabilization Operations are significant because the status of the STA determines the applicable phosphorus discharge limits. The permits, themselves, must contain TBELS, Technology Based Effluent Limitations, which represent the "minimum level of control that must be imposed" in an EPA issued National Pollutant Discharge Elimination System ("NPDES") permit. 40 C.F.R. § 125.3(a). When TBELS are not adequate to achieve water quality standards for a water body, the Clean Water Act requires discharge limits in NPDES permits to meet water quality standards. 33 U.S.C. § 1311(b)(1)(C). These limits are referred to as Water Quality Based Effluent Limits ("WQBEL"). At one point, the FDEP derived a WQBEL of 18 ppb to be incorporated as the level of discharge to the EPA to ensure that "discharges do not cause or contribute to exceedances" of the 10 ppb geometric mean phosphorus criterion in the downstream marsh receiving waters.

In a nutshell, Judge Gold's April 14, 2010 Order required the U.S.E.P.A. to require the FDEP to figure out a way to have waters entering the Everglades satisfy Florida's phosphorus numeric criterion of 10 ppb. To that end, Judge Gold ordered the U.S.E.P.A. to issue an Amended Determination by September 3, 2010. The U.S.E.P.A. was directed by Judge Gold to establish in the Amended Determination "specific milestones" providing an "enforceable framework for ensuring

compliance with the [Clean Water Act]." *Miccosukee Tribe*, 2008 WL 2967654 at *39.  Since the time of the January 4, 2011 Report, Judge Gold has issued another order granting the U.S.E.P.A.'s Rule 60(b) motion.  In his April 26, 2011 Order issued in *Miccosukee Tribe v. United States*, Case No. 04-21448-CIV-GOLD, 2011 WL 1624977 (S.D. Fla. Apr 26, 2011), Judge Gold noted that this Court's Order relieving the state of constructing the EAA A-1 Reservoir "free[d] up funds and efforts to be directed elsewhere -with anticipation that this provides the parties with greater ability to achieve the objectives in the Amended Determination." *Miccosukee Tribe*, 2011 WL 1624977 at *12.

### B. Is there a violation of the Consent Decree with respect to the Western Basins?

The parties stipulate that the phosphorus levels in discharges from the Western Basins exceed 10 ppb.  The issue is whether the State Parties have an enforceable obligation to reduce phosphorus concentrations in the Western Basins.  It is undisputed that the Consent Decree has one sentence concerning the Western Basins.  That sentence, found in Appendix C of the Consent Decree, indicates the District agreed to "design and implement control programs for other watersheds outside of the EAA discharging into the EPA, including L3, S140, L28I." (Settlement Agreement at Appendix C at 5.)

In his Omnibus Order (D.E. No. 1623) in this case dated April 27, 2001, Judge Hoeveler addressed enforcement of this one sentence regarding the Western Basins.  He opined that it "seem[ed] patently inequitable to permit parties who are not bound by the terms of the Agreement, to insert items into the Agreement that have obviously not been agreed on by the Settling Parties." Judge Hoeveler added that any enforcement of this provision would have to be a motion seeking the

-5-

Court issue an Order to Show Cause. There is no such motion before the Court. Rather, the Tribe is seeking a declaration of violation with respect to the Western Basins.

Unquestionably, though, the Special Master finds water quality in the Western Basins has not improved since Judge Hoeveler's Omnibus Order. Using language in the Consent Decree, the Tribe asserts the Consent Decree requires discharges from the Western Basins, and all discharges into WCAs 2 and 3 to satisfy the 10 ppb phosphorus limit. (Special Master's Report at 43.) As a fallback position, the Tribe asserts that at a minimum the State Parties have the obligation to implement reasonable "control programs." The Tribe argues the control programs' failure to achieve results leads to the inevitable conclusion that the control programs are not reasonable. Like the Tribe, Audubon stitched various portions of the Consent Decree to make the textual argument that the Consent Decree obligates the District to achieve phosphorus reduction in the Western Basins.

Disagreeing with the Tribe and Audubon, the Special Master concludes the District has complied with the one sentence by implementing control programs. Mr. Adorisio, the District Engineer, Supervisor for the Water Resource Regulation Department, testified as to various control programs. (Special Master's Report at 52-53.) True they have not been very successful in combating nutrient pollution, but the Special Master opines that it cannot be said that the District has failed to implement reasonable control programs – the only obligation contained in the Settlement Agreement as to the Western Basins.

        *1. Are WCAs 2 and 3 encompassed in the scope of the Consent Decree's obligations?*

The Special Master disagrees with the Tribe and Audubon that the Consent Decree creates

an enforceable obligation to reduce phosphorus in Water Conservation Areas 2 and 3. He writes the Settlement Agreement contains express enforcement language with respect to inflows into the Park and the Refuge, but not WCAs 2 and 3. The Special Master also examines the initial complaint, which he finds did not include a claim for inflows into WCAs 2 and 3. Moreover, the language that the Tribe and Audubon weave together to make the argument is located in the recitals portion of the agreement, not intended to create an obligation. If there is an unacceptable level of nutrient pollution in WCAs 2 and 3, the Special Master opines the Clean Water Act and Florida law govern.

> B. *Is there a phosphorus load requirement in the Decree? Has there been compliance?*

> Paragraph 8A of the Consent Decree provides as follows:

> Phosphorus loads discharged from the EAA will be reduced by approximately 80% to the EPA by October 1, 2003 and will be reduced by approximately 85% to the Refuge by February 1, 1999, as compared to mean levels from 1979 to 1988.

There is no dispute that the 80% load reduction from these sources in the EAA to the EPA produces a figure of approximately 41 metric tons (20% x 205). There is no dispute that the 85% load reduction from these sources to the Refuge produces a figure of approximately 15.75 metric tons. The United States and the Tribe agree that these load reductions are prescriptive. Where they part ways is that the United States agrees the District has complied with the load reduction requirements. The Tribe vehemently asserts the District did not.

The State Parties disagree the load reduction requirements are "requirements" under the Consent Decree and view them as expectations. The State Parties base their argument on the lack of enforcement language or as they call it "trigger language." Relying on the language of Appendix

C of the Decree, the State Parties emphasize that the load reductions are a "by-product of achieving the phosphorus concentration limits." (Special Master's Report at 65.) The Special Master agrees with the State Parties. He finds that Paragraph 8A, referenced above, is included in one of the summaries identified in Paragraph 6. Paragraph 6 directs that "if a conflict arises between the following summaries and the Appendices, the Appendices shall prevail." There is no doubt in the Special Master's view that Appendix C focuses on the control program and not the actual load reductions, which are referred to as an "objective." The Special Master opines the focus is on the "actions that must be taken." (Special Master's Report at 70.) Based on the directive of Paragraph 6 and the focus on control programs, the Special Master concludes the load reduction language of Appendix C does not impose a compliance obligation. (Special Master's Report at 71.) Even if the Special Master found the load reductions obligatory, he goes on to say that he would not agree with the Tribe's evidence that the State has failed to meet those objectives. He adds that if the State Parties meet the long-term limits, now in-effect, the issue of load reduction becomes irrelevant.

### C. Was there a Violation of the Appendix A Long Term Limit in September 2008?

To determine compliance with the long term limit, the District collects weekly samples and reports monthly data based on bi-weekly samples. Compliance is measured annually. In the 2007-2008 compliance period, the monthly data exceeded the long-term limit computed through August 2008. The issue that arose was one with quality control. The September 3, 2008 sample at Station 12A presented a quality assurance problem when a cleanser of the sampling equipment was found to contain phosphorus. The sample that was collected with the contaminated equipment was "flagged." If the flagged data is used, the annual flow weighted mean of phosphorus inflows to

Shark River Slough was 10.2 ppb. If, however, the "flagged" data is excluded the mean is 10.6 ppb, or .4 higher than the Appendix A long term limits. This begs the question – must the flagged data necessarily be excluded. The answer turns on a series of factors. (Special Master's Report at 83.)

The issue was presented to the TOC at a January 29, 2009 meeting. The District decided to include the flagged data in the presentation to the TOC explaining that the data did not vary from the prior or subsequent week's data. (Special Master's Report at 84.) Dr. Walker, a consultant to the Everglades National Park, produced a paper to the Department of the Interior after the TOC meeting, at which no vote was taken, where he criticized the inclusion of the flagged data. Along with other experts, he suggested the inclusion was self-serving to achieve compliance, rather than trigger the TOC process of determining the cause of the exceedance, error or extraordinary natural phenomenon. There was never a decision made by the TOC on this issue. Rather for three years now, the compliance data for Shark River Slough equaled the long-term limit for 2009-2010.

The Special Master opines that the Settlement Agreement created a procedure for this situation and the District did not have the unilateral right to include the flagged data. Rather, the TOC had the role to "plan, review, and recommend" "all monitoring and compliance." (Special Master's Report at 96) (quoting Settlement Agreement at paragraph 18). The proper approach was to exclude the data and prove to the TOC that the 10.6 ppb figure was due to error. He recommends to this Court that it compel the District to report the flagged data to the TOC and let the TOC determine if the exceedance was due to error or extraordinary natural phenomena.

The Special Master makes this recommendation mindful that the "Consent Decree is designed to succeed, not to punish. It is a remarkable document in that representatives of the United States and the State of Florida attached themselves to each other to restore the flora and fauna of the

impacted Everglades by reducing phosphorus concentrations despite being unable to predict how well STAs would actually function in relation to their design, how much STA acreage would actually be needed, how much it would rain, where it would rain, what the water needs would be of South Florida, and how to deal with Lake Okeechobee water levels, among other factors involving Mother Nature over which there is never any control." (Special Master's Report at 102.)

> D.   *What is the scope of applicability of the Class III Phosphorus Criterion in the Everglades?*

Florida's Phosphorus Rule contains the Class III numeric criterion for water quality in the Everglades Protection Area: 10 ppb computed as a long-term geometric mean. § 62-302.540(4)(a), F.A.C.. Within the Refuge, compliance is measured at 24 stations where sampling of water takes place. The Phosphorus Rule has four parts.[1] There is no dispute that the water quality in the Refuge failed the first part of the test for 2005-2009 and the third part of the test. (Special Master's Report at 110.) Water quality also failed the fourth part of the test. *Id.*

The parties dispute the consequences of these failures. The State Parties say there is no applicability of the Phosphorus Rule under the Consent Decree and the failures are inconsequential.

---

[1]The Phosphorus Rule has four parts:

(1)   The five-year geometric mean averaged across all stations is less than or equal to 10 ppb.

(2)   The annual geometric mean averaged across all stations is less than or equal to 10 ppb for three of five years;

(3)   The annual geometric mean averaged across all stations is less than or equal to 11 ppb; and

(4)   The annual geometric mean at all individual stations is less than or equal to 15 ppb.

Judge Gold found portions of this test to violate the Clean Water Act, an order that is currently on appeal.

The Farm Interests and U.S. Sugar agree with the State.  The United States, the Tribe, and the environmental intervenors, including Audubon, disagree.  This issue forms the basis of the United States' Motion for Resolution of Liability Issues.

To determine whether there are consequences to the test failures, the Special Master analyzes the "whichever is lower" language, a phrase that appears a few times in the Consent Decree.  Two key provisions found in Appendix B are as follows:

> If the TOC determines Class III total phosphorus concentration levels are lower than the long term total phosphorus concentration levels then the lower levels shall apply.
>
> If the lower of the Class III or long-term levels is not met by December 31, 2006 and the 50 ppb maximum annual discharge limit is being met at all inflow structures into the Refuge from the EAA, the TOC will recommend a lower maximum annual discharge limit for the structures to be enforced by DEP.  Additional actions, such as regulatory measures and increased STA acreage, as appropriate from the empirical data on performance of each program, will be required by either DEP or the District

Paragraph 5 of the Settlement Agreement, lacks the "whichever is lower" language, but the Special Master nonetheless finds it instructive in deciding the Class III criterion issue.  It reads:

> The State parties shall take such action as is necessary so that waters delivered to the Park and the Refuge achieve state water quality standards, including Class III standards by December 31, 2006.  The State Parties commit:
>
> A. To achieve interim phosphorus concentration limits and levels as reflected in Appendices A and B, by October 1, 2003, and February 1, 1999 respectively.
>
> B. To achieve long-term phosphorus concentration limits and levels, as reflected in Appendices A and B, by December 31, 2006.

The United States argues that paragraph 5, cited above, establishes an "unqualified obligation" on the State Parties "to take such action as is necessary so that waters delivered to the Park and Refuge achieve state water quality standards, including Class III standards by December 31, 2006." The United States adds that as to the rest of the Refuge, where the Appendix B concentration levels do not apply[2], the State Parties are nevertheless obligated to meet the Class III Criterion. The State Parties disagree and rely on a December 20, 2006 vote of the TOC, where the group addressed the "whichever is lower" language but did not reach a consensus as to whether the Class III levels or the long-term concentration levels were lower and which applied.

The United States views this vote as immaterial arguing that had the TOC found the Appendix B limits lower than the Class III criterion, the State would be relieved of meeting the Class III level for water quality in the 40% of the Refuge not covered by the 14 sampling stations. Basically, the United States argues the State Parties' reading would mean that the District "would not have to deliver water to the Refuge that achieves Class III level water quality and would allow inflow to the Refuge of water containing excess nutrients as long as there is compliance with Appendix B at the 14 interior Refuge sampling stations." (Special Master's Report at 117.)

Concluding that the State Parties are in violation of the Class III numeric criterion, the United States turns to Paragraph 8D of the Settlement Agreement which deals with the maximum annual discharge limit. It reads:

> DEP will require compliance with a maximum annual discharge limit of 50 ppb for Refuge inflows if the interim or the lower of the long-term marsh concentration levels Class III nutrient criteria are not

---

[2]Appendix B's fourteen station network covers only 60% of the Refuge, in contrast with the 24-station network used for compliance with the four-part test.

being met by the effective dates. By December 3, 2006, if the 50 ppb maximum annual inflow discharge limit is being met but the lower of the long-term marsh concentration levels or Class III nutrient criteria is being violated, DEP will enforce more stringent inflow discharge limits.

In 2009, when the maximum annual discharge limit was 50 ppb, the concentration in waters discharged from STA-1E and STA-1W was 21 ppb and 36 ppb respectively. These concentrations fell below the maximum annual discharge limit of 50 ppb, yet the Class III nutrient criterion was not met. When this happens, the United States argues the FDEP has the obligation to lower the maximum annual discharge limit. (Special Master's Report at 119.)

The United States argues the Court should lower the maximum annual discharge limit to match the value of the WQBEL contained in the EPA's September 3, 2010 Amended Determination prepared in response to Judge Gold's April 14, 2010 Compliance Order: discharges from the STAs may not exceed (1) 10 ppb as an annual geometric mean in more than two consecutive years, or (2) 18 ppb as an annual flow-weighted mean.

The Special Master explains the other parties' views on the adoption of a WQBEL. The State Parties advance arguments against the Court's adoption of a WQBEL asking the Court allow the administrative processes to set the appropriate value. The Tribe agrees with the United States that the Class III Criterion applies in the Refuge, but urges the Court not to adopt a WQBEL because there is insufficient information to do so. Audubon agrees the Class III Criterion applies but requests the Court adopt the EPA's WQBEL to protect the water quality in the Refuge. U.S. Sugar and the Farm Interests' position supports the argument of the State Parties that the administrative process is the best way to resolve this issue.

In reviewing these arguments, the Special Master disagrees with the State Parties and finds the Class III Criterion applies in the Refuge. He also disagrees with the United States and Audubon and finds the TOC must first decide the appropriate WQBEL. He writes: "That is a prerequisite under the Consent Decree that must be respected." (Special Master's Report at 145, 148-49.)

### E. Issues dealing with construction defects of STA-1E

Casting blame on a third-party, the State Parties invoke the delays and defects in the construction of STA-1E as the culprits for failure to meet the applicable phosphorus concentrations limit in the Refuge. The Army Corps of Engineers was responsible for completing STA-1E by July 1, 2002. (Settlement Agreement at Appendix C at 5.) The ACOE did not transfer the STA to the District until 2005. The ACOE acknowledges that there are deficiencies in STA-1E. Due to the status of reviews by the agencies, the Special Master recommended the Court defer this matter.

### F. Summary of Special Master's Conclusions

The Special Master concludes his report with a helpful summary of his recommendations. He recommends that the Tribe's Motion Seeking a Declaration of Violations be denied to the extent it seeks to: (1) declare a violation of the "load reduction requirements"; (2) establish 10 ppb as the outflow limit from an STA; (3) declare that under the terms of the Consent Decree the Class III numeric phosphorus criterion applies to STA discharges to WCA-2 and WCA-3; (4) declare a violation of "Western Basin requirements"; and (5) declare a violation of Appendix A.

As to the United States' Motion for Resolution of Liability Issues, the Special Master recommends that the motion be denied without prejudice as the TOC is charged with first deciding

this technical issue prior to judicial involvement.

The Special Master also recommends the Court grant these motions as set forth in his Report to the extent they seek to have the Court decide compliance with the long-term limit for the Shark River Slough and the applicability of the Class III Criterion.


## Miccosukee Tribe's Objections to the January 4, 2011 Special Master's Report

*A. Objection: The Class III Criterion Applies to Discharges into the Entire EPA, including Water Conservation Areas 2 & 3*

The Tribe objects to the Special Master's finding that the Settlement Agreement does not govern phosphorus discharges into Water Conservation Area ("WCA") 2 and WCA 3, which includes the Tribal homelands. The Special Master concluded that the Settlement Agreement does not create an enforcement regime or enforceable obligation with respect to WCAs 2 and 3 because the "Settlement Agreement contains enforcement language only with respect to inflows to the Park and the Refuge." (Special Master's Report at 47.)  It is the Tribe's position that the Settlement Agreement governs water quality standards in the entire Everglades Protection Area ("EPA"), including the National Park, the Loxahatchee Refuge and the WCAs.

The Tribe first points to Judge Hoeveler's order allowing it to intervene in this case, which states that "[a]pproximately one-half of the Tribe's Federal Reservation and the entirety of the two additional properties occupied by the Tribe lie within the area to be protected under the Settlement Agreement." (Order on the Motion of the Miccosukee Tribe of Indians to Intervene as Party Plaintiff, D.E. 1935 at 2.)

Relying on the Memorandum of Agreement ("MOA") between the Tribe and the United

States, the Tribe asserts that it agreed not to pursue its own lawsuit because its Tribal homeland found in WCA 3A was protected by the Settlement Agreement. The MOA states that the parties to the agreement "share common concerns and interests in protecting the Everglades ecosystem" and "ensuring that water in the Everglades ecosystem meets applicable water quality standards." The Tribe claims this language is broad enough to encompass WCAs 2 and 3. In the Tribe's view, the Special Master's reading of the Settlement Agreement to exclude WCAs 2 and 3 renders the MOA a "fraudulent treaty" with the Tribe.

The Tribe also relies on the Settlement Agreement itself to assert that WCAs 2 and 3 come within its purview. The Settlement Agreement states "[t]he State Parties shall take such action as is necessary so that waters delivered to the Park and the Refuge achieve state water quality standards, including Class III standards, by December 31, 2006. (Settlement Agreement at 9.) The Settlement Agreement also explains, "[w]ater from the EAA eventually flows into the Park through the WCAs. Thus, maintenance of state water quality standards within the WCAs is crucial to the ecology of the Park." *Id.* at 7. To accomplish this objective, the Tribe argues the Settlement Agreement required the construction of six STAs that directly discharge into the Refuge, and WCAs 2 and 3. (Settlement Agreement at 13.) It relies on the language of the Settlement Agreement that states the STAs "will be designed, operated, and managed primarily to purify the water before it enters the WCAs, the Park and the Refuge." (Settlement Agreement at 13.)

Pointing to the Appendices to the Settlement Agreement, the Tribe argues that WCAs 2 and 3 are within the scope of the protection. Appendix C, which is entitled *Stormwater Treatment Areas*, contains a sub-heading entitled *Control Program to Achieve Compliance with the Class III Criteria*, and requires a research program to interpret Class III for the entire Everglades, including the WCAs.

(Settlement Agreement at Exh. C.)  Appendix D requires the indices from the research "be used to

determine the criteria for compliance in the EPA."  The Everglades Protection Area ("EPA") is

defined as "Water Conservation Areas 1, 2A, 2B, 3A, 3B, the Arthur R. Marshall National Wildlife

Refuge and the Everglades National Park." (Settlement Agreement at Exh. D.)

Recognizing the Settlement Agreement does not provide enforcement language for

phosphorus exceedances in the WCAs 2 and 3, the Tribe argues that the Court in this litigation has

found violations of the Settlement Agreement, even in the absence of an enforcement mechanism.

Citing to this Court's June 1, 2005 order, the Tribe concluded the District violated the Settlement

Agreement by failing to timely construct STA 3/4 even though the Settlement Agreement provides

no express deadline.

The Tribe also supports its argument with testimony from the hearing before the Special

Master.  Dr. Bill Walker, a federal government scientist and another principal author of the

Agreement testified that the purpose of the Settlement Agreement was to achieve the Class III

criterion throughout the Everglades Protection Area of 10 ppb. He testified: "The whole idea was

to eliminate the use of the Water Conservation Areas as treatment areas and, just as I described,

essentially move that phosphorus gradient . . .out of the marsh up into the stormwater treatment area

and try to use other techniques to keep that gradient upstream."  (Evid. Hr'g. Tr. Vol. 5 at 667.)

*B. Objection: State Parties are in violation of the Consent Decrees Requirement to Design
and Implement Control Programs for the Western Basins*

Recognizing that the water quality track record in the Western Basins is not reassuring, the

Special Master finds the Consent Decree does not establish water quality goals for that area. Rather,

the Special Master finds the Consent Decree merely requires the South Florida Water Management District "design and implement control programs for other watersheds outside of the EAA discharging into the EPA, including the L3, S140,L281." (Special Master's Report at 42.)

The Tribe objects to this finding. In its view, the "control programs" are not "reasonable" because they are not accomplishing the goal of reducing the phosphorus discharges from the Western Basins. Tribal witness Eugene Duncan testified that the control programs were reasonable and minimal, but he added that "a lot more needs to be done" to achieve the Class III Criterion for water quality in the Western Basins. (Evid. Hr'g. Trans. Vol. I at 52.)

*C. Objection: The State Parties have failed to achieve the Consent Decree's Load Reduction Requirements in the Everglades Protection Area and the Loxahatchee Refuge*

Once again, the issue is the enforcement mechanism. The Special Master concludes the load reduction requirements of the Consent Decree are not prescriptive because the Consent Decree does not expressly provide a remedy for the violation of these requirements. The State Parties agree with the Special Master's reading that the load reduction provisions are not an enforceable obligation, and that even if they are, the State Parties have met them, as interpreted by the TOC. The crux of this issue is the purported failure to achieve an 80% reduction of phosphorus loads from the Everglades Agricultural Area to the Everglades Protection Area by October 1, 2003 and an 85% reduction of phosphorus loads from the EAA to the Loxahatchee Refuge by February 1, 1999 (or by December 31, 2006) as compared to the 1979 to 1988 mean levels.

The Tribe again objects to the Special Master's passive reading of the Consent Decree. In its view, the load reductions are required and the Court must require the State Parties to meet the

load reduction goals.

### D. Objection: The Exceedance of the Appendix A Limits for Water Year ending September 30, 2008 Constitutes a Violation of the Consent Decree

Appendix A provides that an exceedance occurs for discharges to the Park if the flow-weighted mean concentration for the water year ending September 30th "is greater than the 10% rejection level of the computed limit." (Special Master's Report at 96.)  Appendix A defines an exceedance that constitutes a violation.  It states: "An exceedance constitutes a violation unless the TOC determines there is substantial evidence that it is due to error or extraordinary natural phenomena." (Appendix A, at 3-4.)

As for the 2008 exceedance, the Special Master did find the "District did not act consistently with the Settlement Agreement by unilaterally presenting in the Settlement Agreement report a concentration in the water year ending September 30, 2008 of 10.2 ppb when flagged data existed. The proper approach was to show 10.6 ppb as the compliance concentration and then to invoke the review process of the Settlement Agreement to show that this concentration was due to error. . .." (Special Master's Report at 97.)  The Special Master recommends the Court direct the District to modify the Appendix A compliance tracking result for the water year ending September 30, 2008 to show a concentration of 10.6 ppb and then to direct the TOC to follow the Settlement Agreement's terms as outlined to determine if the exceedance was due to error.

The Tribe objects to this recommendation arguing the State Parties should not now have an opportunity to go before the TOC. Rather, the Tribe requests the Court find this is a violation of the Consent Decree.

*E. Tribe's Agreement with the Special Master: The State's Class III Criterion applies in the Loxahatchee Refuge under the Consent Decree and the State Parties are not in Compliance*

The Special Master found the Class III phosphorus numeric criterion is applicable under the Consent Decree to the Refuge. The Class III Criterion as implemented by the four-part test has not been satisfied in the Refuge based on the published data from the monitoring network in place. (Special Master's Report at 152.) The Special Master opines that the TOC must recommend to the "FDEP a lower 'maximum annual discharge limit' in the inflows to the Refuge from the STAs discharging into the Refuge. If the TOC fails to make a recommendation, the FDEP then must independently act under Appendix B and Paragraph 8D to enforce a more stringent inflow discharge limit." (Special Master's Report at 153.) The Tribe does not disagree with this finding except the Tribe would have this Court set the maximum annual discharge limit.

## Farm Interests' Objections to the January 4, 2011 Report of the Special Master

The main objection the Farm Interests present to the Special Master's finding that the Class III Criterion applies in the Refuge. The Farm Interests also object to the Special Master's background statements implying that fertilizer used by the sugar farmers is the primary source of phosphorus pollution in the Everglades.

## U.S. Sugar's Objections to the January 4, 2011 Report of the Special Master

Like the Farm Interests, U.S. Sugar also takes issue with the statement in the Special Master's

Report implying that the fertilizer used by sugar farmers is the source of phosphorus in the Everglades. U.S. Sugar argues the language of the Report assumes the EAA is the only source of stormwater entering the Everglades or the cause of elevated phosphorus concentrations. As that issue was not before the Special Master, U.S. Sugar claims the statement is not supported by the record.

## Conservation Interests' Objections to the Special Master's January 4, 2011 Report

The Conservation Interests[3] object to the Special Master's finding that the State Parties had no obligation under the Consent Decree to reduce phosphorus in WCAs 2 and 3. In their view, the Consent Decree is a control program of BMPs and STAs meant to reduce phosphorus loading into the entire Everglades Protection Area (EPA), which includes WCAs 2 and 3.

The Conservation Interests also object to the Special Master's finding that the Consent Decree does not impose a compliance obligation to reduce phosphorus loads. Citing to the amendments to the Consent Decree's paragraph 8A, the Conservation Interests argue the amendments would have been meaningless if the load reductions were not enforceable provisions.

The Conservation Interests agree with the Special Master that there is a violation of Appendix A's phosphorus limits for Shark River Slough for the October 2007 to September 2008 time period. The Special Master opined this issue should be remanded to the TOC for a determination as to whether the exceedance was due to error or extraordinary natural phenomena.

---

[3]The Conservation Interests include the Sierra Club, National Wildlife Federation, Florida Wildlife Federation, Defenders of Wildlife, National Parks Conservation Association, Florida Chapter Sierra Club, and the Audubon Society of the Everglades.

As to the Western Basins, the Conservation Interests disagree with the Special Master that the State Parties have implemented reasonable control programs.

As to the Class III Criterion, the Conservation Interests' position is in line with the United States. The groups agree the Class III Criterion applies, but request the Court issue a maximum annual discharge limit. They argue deference to the TOC will result in too much delay.

## DISCUSSION

"The Consent Decree is designed to succeed, not to punish." These words are repeated throughout the Special Master's January 4, 2011 Report. The Court agrees that a finding of a violation of the Consent Decree is not meant to penalize the State Parties. Rather, a violation caused by a phosphorus exceedance is meant to set off warning bells that there is a flaw in the process. The Consent Decree creates a process to deal and hopefully, eradicate excess phosphorus. To that end, the Special Master examines the issues before him as referred by this Court's March 31, 2010 Order. Having considered the objections to the Report and the evidence presented before the Special Master, the Court agrees with the recommendations of the Special Master.

To interpret the Consent Decree, the Court agrees it should be construed as written. *Reynolds v. Roberts*, 202 F.3d 1303, 1312-1313 (2000) (*Reynolds II*). The meaning "must be discerned within its four corners." *United States v. Armour & Co.*, 402 U.S. 673, 682 (1971). A court should read a decree in a manner that accomplishes its "basic purpose." *Hughes v. United States*, 342 U.S. 353 (1952).

Mindful of these principles of contract interpretation, the Court reviews the Special Master's recommendations and the objections to those recommendations. At the outset, the Court notes that the Farm Interests and U.S. Sugar object to the Special Master's introductory remarks where he

explains that the storm-water runoff from the sugar farms carries phosphorus into the Everglades. These groups request the Court excise those statements from this Order adopting the Report. The Court agrees with the Farm Interests and U.S. Sugar that the issue of identifying sources for phosphorus was not before the Special Master. That being said, it is inconsequential at this juncture to excise the statement. The runoff from the sugar farms has been identified as an impetus to this litigation almost a quarter century ago. The issues before the Court now are remedial. Are the parties complying with their Consent Decree obligations? How do we as a collective group, the judiciary, the United States, the State Parties, the Tribe, the Farm Interests, and the Conservation Interests utilize our respective roles in this case to reduce nutrient pollution in the Everglades and restore the flora and fauna to its organic state? That is what we are grappling with here and we should focus on the future and what can be done given an increasingly tight budget.

With this backdrop, the Court proceeds to analyze the Special Master's legal and factual findings *de novo* pursuant to Federal Rule of Civil Procedure 53(f).

## A. Recommendation Regarding the Western Basins

It is no doubt disappointing that all the parties agree the water quality in the Western Basins remains poor after so many years of implementing programs. The Tribe urges the Court to view this issue in a results-oriented manner. Water quality is poor herego the State Parties are not complying with the Decree. The Court agrees with the Special Master that there is no remedy to enforce and the testimony establishes that the State Parties have implemented reasonable control programs. (Special Master's Report at 52-3) (describing the testimony of Mr. Adorisio regarding the programs in the Western Basins).

-23-

Moreover, Judge Hoeveler's April 27, 2001 Omnibus Order establishes the law of the case on this issue. As explained by the Special Master, Judge Hoeveler found the requirement was limited to what was in the Decree and he denied the request to "insert items into the Agreement that have obviously not been agreed to by the Settling Parties." (Omnibus Order, D.E. 1623.)   Judge Hoeveler added that the proper method to seek such relief would be a motion for an order to show cause. That is not the motion before the Court. Rather, the Tribe is seeking the Court find the State Parties in violation. The Court will not so find as the evidence supports compliance with the establishment of control programs – the only requirement of the Decree.

### B. Recommendation to Exclude WCAs 2 and 3 from the scope of the Consent Decree

The crux of the Tribe's objections is with respect to the inclusion of WCAs 2 and 3 in the Consent Decree's purview. Like the Western Basins, the Court does not find there is a clear enforceable obligation in the plain language of the Consent Decree. First, Appendices A and B of the Decree that set forth the phosphorus limits speak only to those limits applying to the Loxahatchee Refuge and the Park. The limits set forth in those Appendices do not apply generally to the Everglades Protection Area.

A reading of the original complaint in this case reveals that at its heart this lawsuit was about phosphorus discharges into the Loxahatchee Refuge and Everglades National Park. The suit was not intended to specifically state a cause of action relating to phosphorus exceedances in WCAs 2 and 3. While as a general goal throughout this litigation, the parties and the Court have spoken more generically in Court orders and other documents to reduce phosphorus in the Everglades, the Court must before enforcing a particular obligation look carefully at the governing documents. The

complaint and the Consent Decree govern and the Court now finds that there is no specific limit that applies in WCAs 2 and 3 that this Court can now enforce.

The Tribe cites to paragraphs 10A and 10B, which fall into a section titled "Implementation of Stormwater Treatment Areas." Neither paragraph creates a phosphorus numeric criterion that this Court can enforce in WCAs 2 and 3. The paragraphs refer to limits in the general sense, and the only limits identified in the Consent Decree are the ones in the Appendices A and B. Thus, the Tribe's reliance on paragraphs 10A and 10B does not advance their argument.

Likewise, the Tribe's reliance on paragraph 10, which falls under the subheading, "Committing to Restoring and Maintaining Water Quality" also does not convince the Court that there is an enforceable obligation as to WCAs 2 and 3. This paragraph contains five subheadings that refer to the limits set forth in the Appendices A and B. To reiterate, Appendices A and B only contain limits as to the Refuge and the Park. Moreover, there is a provision in paragraph 6 of the Settlement Agreement that provides "if a conflict arises between the following summaries and the Appendices, the Appendices shall prevail."

Page 7 of the Settlement Agreement is another provision that the Tribe weaves with others to advance its position that the State Parties are obliged to lower phosphorus limits in the WCAs 2 and 3. The Court agrees with the Special Master that this provision is a recital to provide context to those reading the Consent Decree. A reading reveals no enforceable obligation as to WCAs 2 and 3.

The Audubon joins the Tribe's efforts and argues Paragraph 8(A) does refer to reductions in phosphorus loading from the EAA to the EPA. This language does not, however, create an enforcement regime for the numeric phosphorus criterion akin to what is created for the Refuge and

the Park. Moreover, the provision is in a section, whose title limits its applicability to the Refuge. The reliance by Audubon on paragraph 11(A) also fails as it does not establish interim or long-term limits for the WCAs 2 or 3.

This reading of the Consent Decree gives it the plain meaning as required by *Reynolds I.* It is not to say that there are no water quality standards for WCAs 2 and 3. Rather, the water quality in WCAs 2 and 3 would be governed by Florida law and Clean Water Act as the terms of the Consent Decree do not apply.

### C. Recommendation to find the load reductions are not obligatory

In *Sierra Club v. Meiburg*, 296 F.3d 1021 (11th Cir. 2002), the Eleventh Circuit cautioned that a court is obligated to look at the precise language of a Consent Decree. In a Clean Water Act case, the Eleventh Circuit stated that "[i]f the parties had intended for the decree to put such an important and substantial responsibility on EPA, they would have spelled out just [as] they spelled out its responsibility to establish [Total Maximum Daily Loads]." *Id.*, 296 F.3d at 1030.

Again, the Court does not see spelled out in the Agreement a requirement to lower the phosphorus loads. The relevant provision, which the Special Master examines, is Paragraph 8A, which states:

> Phosphorus loads discharged from the EAA will be reduced by approximately 80% to the EPA by October 1, 2003, and will be reduced by approximately 85% to the Refuge by February 1, 1999, as compared to mean levels measured from 1979 to 1988.

The Court agrees that use of the passive voice and the use of the word "approximately" makes it difficult to argue that the writers of this provision were seeking a mandatory compliance obligation.

The Special Master aptly states: "For it to be mandatory, the load reduction percentage would have to be fixed in a way that would make it enforceable." (Special Master's Report at 72.) As it reads at the moment, the load reductions are a positive by-product of other compliance measures, which focus on meeting levels and limits. The Conservation Interests advance the argument that the amendments to the Consent Decree are meaningless if there is no requirement to reduce phosphorus loads. There is no question that the Consent Decree embraces load reductions as a desirable effect of reduced nutrient pollution, but the language is not compelling enough for this Court to impose a remedy for a violation.

Like the Special Master, the Court is also persuaded that there is no enforceable obligation as to the load reductions because the Consent Decree contains no recourse in the event the load reductions are not met. By way of comparison, if there is a violation of the Park and Refuge phosphorus concentration limits, the Settlement Agreement requires "additional remedies." (Settlement Agreement at C-4.) Because the Court finds the Settlement Agreement does not create an enforceable obligation to reduce the phosphorus loads by the 80% and 85% mark, the Court need not reach the issue of whether there was compliance with that load reduction.

### D. Recommendation to find there was an Appendix A violation that should be remanded to the TOC for a determination of error or extraordinary natural phenomena

Unquestionably, there was a phosphorus exceedance in the 2007-2008 data for Shark River Slough. The parties dispute the proper procedure to employ to deal with this exceedance. In reviewing this issue, the Special Master is cognizant that Consent Decree violations do not necessarily trigger penalties, but are meant to signal environmental red flags that the parties must

address to achieve overall compliance.

To that end, the Court agrees with the Special Master's recommendation regarding the appropriate course of action. The Court also agrees that the State Parties failed to follow the procedure of the Consent Decree by unilaterally determining to include the flagged data. Rather, the proper course would have been to exclude it and allow the TOC to determine the cause of the exceedance be it error or extraordinary natural phenomena. Because that was not done, the Court will give the TOC an opportunity to evaluate the issue. The State Parties shall file a summary of the TOC proceedings on this issue by no later than **December 14, 2011**.

E. *Recommendation that the Class III Phosphorus Criterion applies in the Refuge but requesting the Court defer setting a maximum annual discharge limit*

The Special Master agrees with the United States, the Tribe, and the Conservation Interests and finds the Consent Decree embraces the Class III Phosphorus Criterion. The State Parties have moved to adopt the Special Master's Report and have not objected to this finding. Accordingly, the Court accepts the finding that the Class III Criterion applies to the Refuge.

Rather, the dispute is focused on what does the Consent Decree dictate if the Class III Criterion is not met. The United States would like the Court to adopt the Special Master's Report in part by finding the State Parties in "violation" as opposed to finding the failure is a "trigger for action." This is a matter of semantics and phraseology. As noted by the Special Master, time and again, the Consent Decree is meant to succeed and not punish. Whether the Court finds a violation or not, the Court must decide what the appropriate recourse is to address the failure to meet the Class III Criterion. The United States in its motion to adopt recognizes that this is the crux of the issue and

not the actual label on the failure, whether it be a violation or a trigger for action.

The question then is what to do about the failures. The Special Master opines that the TOC must first make a recommendation on a lower maximum annual discharge limit. In responding to the Master's Report, the United States and the State Parties are in agreement that the TOC should be the first to examine the issue of the appropriate level, and not this Court. Plainly, that is the Consent Decree's framework. Although the Tribe would request the Court set this more stringent inflow limit, the Court will defer to the Consent Decree's procedure. The State Parties are to advise this Court on the status of the TOC's review of this issue by no later than **December 14, 2011**. If the TOC does not agree on a recommendation, then the Consent Decree provides that the FDEP shall decide a more stringent limit.

### F. Recommendation that the Court defer ruling on the issues relating to the construction of STA-1E

To defend the failures to comply with the Class III Criterion, the State Parties argue the Army Corps. of Engineers deficiently constructed STA-1E. The Special Master correctly finds the TOC is in a better position to evaluate the impact of STA-1E on water quality results. The TOC's decision regarding the maximum annual discharge limit is also relevant to considering what additional work is needed to meet those limits at STA-1E. Accordingly, the State Parties are free to raise the issues regarding STA-1E, once that information is available and the TOC has opined.

## CONCLUSION

In summary, the Court adopts the January 4, 2011 Special Master's Report consistent with this Order. The Court grants the State Parties' Motion to Adopt and grants in part the United States' Motion to Adopt the Report in part.

The Court denies the Motion Seeking a Declaration of Violations to the extent it seeks to: (1) declare a violation of the "load reduction requirements"; (2) establish 10 ppb as the outflow limit from an STA; (3) declare that under the terms of the Consent Decree the Class III numeric phosphorus criterion applies to STA discharges to WCA-2 and WCA-3; (4) declare a violation of "Western Basin requirements"; and (5) declare a violation of Appendix A.

As to the United States' Motion for Resolution of Liability Issues, the Court denies the motion without prejudice as the TOC is charged with first deciding this technical issue prior to judicial involvement.

The Court grant these motions to the extent they seek to have the Court decide compliance with the long-term limit for the Shark River Slough and the applicability of the Class III Criterion.

DONE AND ORDERED in Chambers at Miami, Florida, this 22ⁿᵈ day of September, 2011.

_____

FEDERICO A. MORENO
UNITED STATES DISTRICT JUDGE

Copies provided to:

Counsel of Record

-30-