UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Miami Division

**Case Number: 88-1886-CIV-MORENO**

UNITED STATES OF AMERICA,

      Plaintiff,

vs.

SOUTH FLORIDA WATER MANAGEMENT
DISTRICT *et al.*,

      Defendants

_____/

## REPORT OF THE SPECIAL MASTER (March 1, 2012)

One of the outstanding items contained in the Court's "Order Granting Motion to Adopt the Special Master's Report, Motion Seeking Declaration of Violations, and Motion for Declaration of Breach of Commitments" dated March 31, 2010 ("March 31 Order") [DE 2134] is the Court's instruction to recommend "realistic mutually-agreeable deadlines" for the completion of projects listed on Appendix A to the Report of the Special Master (July 5, 2006) [DE 1976]. March 31 Order, p. 16.  There are two Appendix A projects not yet completed: stormwater treatment areas (STA) referred to as "Compartments B and C."[1]  I establish deadlines for both projects in this Report and Recommendation to the Court.[2]

---

[1] Compartment B consists of a north and south "build out" of STA-2.  A depiction of these STA build outs appears in the Report of the Special Master (July 5, 2006), p. 65 and also at http://my.sfwmd.gov/portal/page/portal/xrepository/sfwmd_repository_pdf/mitnik_final_t oc_feb_2012.pdf.  Compartment C represents an expansion of STA-6.  *Id.*, p. 67.  See http://my.sfwmd.gov/portal/page/portal/xrepository/sfwmd_repository_pdf/mitnik_final_t oc_feb_2012.pdf.

[2] The last remaining issue in the Court's March 31 Order—remedies for the violation of the Long Term level in the Loxahatchee Wildlife Refuge (Refuge)—will be the subject of a later Report.

This is the table of contents for this Report:

Compartment B and C Submissions ................................................................................ 2

Background Facts ........................................................................................................... 4

Compartment B ............................................................................................................. 8

    Permit from the Corps .............................................................................................. 8

    Permit from the FDEP ........................................................................................... 11

    Growth of Vegetation for Phosphorus Removal .................................................... 14

    Completion of Pumps ............................................................................................ 14

Compartment C ........................................................................................................... 14

    Northern and Southern Flow Ways ........................................................................ 15

    Central Flow Way ................................................................................................. 15

NPDES Permit Issues .................................................................................................. 16

    Judge Gold's July 2008 and April 2010 Orders ..................................................... 16

    The United States' Rule 60 Motion and the State NPDES Permits "Deemed" Submitted to EPA For Review ............................................................................... 18

    The United States' Responses to the Deemed Permits ............................................ 20

Tribe's Submission ...................................................................................................... 22

Recommendation ......................................................................................................... 24

## Compartment B and C Submissions

There were a number of submissions made by the United States, the District, or the Tribe[3] regarding Compartments B and C.

---

[3] When I refer to the participants, I do so as follows. The State of Florida Department of Environmental Protection is "FDEP." The South Florida Water Management District is the "District" or "SFWMD." Together they are the "State Parties." The United States of America is the "United States." The Miccosukee Tribe of Indians of Florida is the "Tribe." Florida Audubon Society is referred to as "Audubon." Sierra Club, National Wildlife Federal, Florida Wildlife Federation, Defenders of Wildlife, National Parks Conservation Association, Florida Chapter Sierra Club, and Audubon Society of the Everglades are the "Conservation Intervenors." West Palm Beach County Farm Bureau, K.W.B. Farms and Roth Farms, Inc. are "Farm Interests." United States Sugar Corporation is "U.S. Sugar."

The United States made these submissions:  (1) Notice of Submission to the Special Master of Declaration of Tori K. White Reporting on § 408 Process (August 17, 2010); (2) Declaration of Tori K. White; (3) Memorandum for Major Subordinate Commands regarding "Policy and Procedural Guidance for the Approval of Modification and Alteration of Corps of Engineer Projects" (October 23, 2006) (Exhibit 1 to the Declaration of Ms. White); and (4) Section 408 Submittal Package Guide (November 12, 2008) (Exhibit 2 to the Declaration of Ms. White).

On October 11, 2010, the District submitted its "Supplemental Report Regarding Compartment B and C Stormwater Treatment Areas."

Because of lingering questions about the schedule for completion of Compartments B and C, I asked the parties to bring together during the hearing that began the week of February 14, 2011, the persons with the most knowledge of what tasks had to be completed before Compartments B and C could treat water.  On February 16, 2011, the following persons convened in a transcribed session to provide an update and answer questions on the operational status of Compartments B and C:

| Witness | Position | For |
|---------|----------|-----|
| John Mitnik | Engineering Projects Division, Director, SFWMD | SFWMD |
| Bob Howard | Engineering Auditor, SFWMD | SFWMD |
| Greg Knecht | Director, FDEP, Office Ecosystem Projects | FDEP |
| Eric Bush | Assistant Chief, Everglades Division USACE, Jacksonville District | Army Corps of Engineers |
| Tori White | Chief, Palm Beach Gardens Section, Regulatory Division, Jacksonville District[4] | Army Corps of Engineers |
| Randy Rabb | Civil Engineer, Design Branch, Engineering Division, Jacksonville District, USACE; & | Army Corps of Engineers |

[4] This was Ms. White's position at the time of the February hearings.  Ms. White became the Deputy Chief, Regulatory Division, of the Corps's Jacksonville District.

| Witness | Position | For |
|---------|----------|-----|
| | District Levee Safety Program Manager | |
| Russ Weeks | Supervisory Civil Engineer, Water Resources Branch, Engineering Division, Jacksonville District, USACE | Army Corps of Engineers |
| Sean Smith | Chief, Water Resources Branch, Engineering Division, Jacksonville District, USACE | Army Corps of Engineers |

By email dated June 23, 2011, I posed additional questions to the parties and received a response dated July 13, 2011, entitled, "Combined Responses and Comments of the Florida Department of Environmental Protection, the South Florida Water Management District, and the U.S. Army Corps of Engineers, to Questions Posed by the Special Master, John Barkett" (July 13, 2011 Combined Response).

In response to additional questions I asked by email on September 7, 2011, I received responses by email from the United States (September 8, 2011, September 12, 2011), the State Parties (September 12, 2011), and the Tribe (September 14, 2011).

Finally, in response to an email for an update on *Miccosukee Tribe of Indians of Florida v. United States*, Case No. 04-21448 (S.D. Fla.), the matter pending before the Honorable Alan S. Gold, I received two additional reports dated February 15, 2012: "United States Report on Status of *Miccosukee Tribe v. United States*, No. 04-21448-Gold" (United States' February 15, 2012  Report) and "Report of the State Parties on the Status of the Litigation Before Judge Gold Including the Appellate Proceedings in the Eleventh Circuit" (State Parties' February 15, 2012 Report).

## Background Facts

Under the Settlement Agreement executed by the parties that became the Consent Decree in this matter, when the geometric mean of the results of two of 12 consecutive sampling events at 14 designated interior sampling stations in the Arthur R. Marshall Loxahatchee National

Wildlife Refuge (Refuge) exceeded the "Interim Level" for phosphorus in effect before January 1, 2007, there was an "exceedance."  An exceedance is a "violation" and triggers the obligation of the State Parties to take additional remedial actions unless the exceedance is excused by a determination of the Technical Oversight Committee that it was due to extraordinary natural phenomena or error.  My July 5, 2006 Report (2006 Report) confirmed the existence of a violation that required remedies.

In my 2006 Report, I included an Appendix A that set forth recommended remedies to address exceedances in the Refuge as well as other remedies that would enhance the capability of the District to treat stormwater containing phosphorus before it entered Water Conservation Areas 2 or 3.  I recommended that the Court enter an order directing the State Parties to implement the projects identified on Appendix A by the end of the "Late Construction Completion" time frames set forth on Appendix A.  July 5, 2006 Report, p. 75.  The Court approved this recommendation in its March 31, 2010 Order, [DE 2134] p. 16.

Construction of Compartment B to add to the treatment area in STA-2 is one of the Refuge-related remedies in Appendix A.  Readers familiar with the geography of the Refuge and these STAs might ask, "Why would additional STA acreage in STA-2 relieve the Refuge of excess phosphorus loading?"  Readers conversant with my 2006 Report will understand the answer.  At the time that Report was issued, the District's vision was to improve the canal conveyance system to give water managers the ability to move water from the S-5 Basin south for treatment in STA-2 or STA-3/4 and thereby relieve stresses on STA-1W or STA-1E that might exist from phosphorus loading in stormwater coming out of the S-5 Basin.  By increasing

the capacity of STA-2 and building the A-1 Reservoir[5] the system as a whole would have greater treatment flexibility.

While it was not directly related to the Refuge, completion of Compartment C of STA-6 would provide additional treatment capacity but, with enhanced canal conveyance capacity might give water managers even greater flexibility to move stormwater to different STAs as might be needed to handle the removal of phosphorus.

This approach did not guarantee that phosphorus concentrations at sampling stations in the Refuge would satisfy Consent Decree long-term levels or the State's numeric phosphorus criterion, but it may have had an ameliorative effect on the Refuge by re-routing water that STA-1W, in particular, did not have the design capacity to treat effectively.

Readers of my August 30, 2010 Report [DE 2200], 2010 WL 6268442 (S.D. Fla.)[6] and January 4, 2011 Report [DE 2235], 2011 WL 4595016 (S.D. Fla.),[7] also know that, in 2008, the State of Florida learned of the opportunity to acquire Everglades land owned by United Sugar Corporation.  The District decided that this opportunity required a reevaluation of how best to meet the requirements of the Consent Decree and the State's numeric phosphorus criterion. Hence, it shelved for the time being improvements in canal conveyance and stopped construction of the A-1 Reservoir.

In so doing, the District eliminated one of the underpinnings of its response to the Refuge exceedances that were the subject of my July 2006 Report.  That fact is not material to the task

---

[5] The A-1 Reservoir was the subject of my August 30, 2010 Report, 2011 WL 1099865 [DE 2268].

[6] This Report was approved by the Court in its March 22, 2011 Order [DE 2268], 2011 WL 1099865 (S.D. Fla.).

[7] This Report was approved by the Court in its September 28, 2011 Order [DE 2291].

currently before me.[8]  I note it merely to emphasize that Compartment B, in particular, was offered as a Refuge-related remedy but it becomes less significant to the health of the Refuge without improved canal conveyance capacity.

Based on dates provided to me by the District, Appendix A to my 2006 Report provided that Compartment B, Phase 1 would be flow capable by the third quarter of 2008, and Compartment B, Phase 2 would see construction completed by no later than the middle of 2010, at the same time as Compartment C's construction would be completed.

As I discuss in more detail below, Judge Gold issued his April 2010 decision in *Miccosukee Tribe of Indians v. United States*, 706 F. Supp. 2d 1296 (S.D. Fla. 2010), a case involving Florida's compliance with the Clean Water Act in establishing water quality standards for phosphorus in the Everglades.  Judge Gold rejected EPA's approval of Florida's Everglades-related phosphorus regulations and directed EPA to issue an Amended Determination of the validity of Florida's Everglades water quality standard consistent with the Clean Water Act.  *Id.* at 1323.  On September 3, 2010, EPA issued that Amended Determination.[9]

As I explain in more detail below, the matter before Judge Gold impacts whether EPA or the FDEP will issue National Pollutant Discharge Elimination System (NPDES) permits to the District (or modify existing NPDES permits) to operate Compartments B and C and when the NPDES permits (or modifications) might issue.  As the Court will read below, it is the approval of NPDES permits that, ultimately, controls when—realistically—Compartments B and C can discharge treated water.

---

[8] The referral was to determine realistic deadlines for the operation of Compartments B and C.  I was not asked to determine whether the failure to comply with the Appendix A dates for operation of Compartments B and C was a violation of the Consent Decree or any of the Court's orders.

[9] The Amended Determination is discussed in my January 4, 2011 Report.  2011 WL 4595016 at *13-14.  It is also DE 458 in Civ-1:04-cv-21448 (S.D. Fla.).

Having established this predicate, let me explain the current status of Compartments B and C and then explain the NPDES permit hurdle that must be overcome before Compartments B and C can meaningfully be operated.

## Compartment B

As of December 2010, Compartment B in its entirety became "flow capable."  Tr. 668 (February 16, 2011).  That means it can receive but not treat water.   When could water be treated in Compartment B?  Assuming that issuance of an NPDES permit was not an obstacle, a "realistic" date by which Compartment B could begin to treat water is July 2012.  July 13, 2011 Combined Response, p. 10.

This date is not free from doubt, however.  Putting aside the issue of an NPDES permit, at least four events still must occur before Compartment B can begin to receive water for phosphorus removal.

### *Permit from the Corps*

First, the Corps must issue a permit to the District to operate Compartment B.  The Corps's permitting process normally occurs only under Section 404 of the Clean Water Act. Here, however, the District's original plans for Compartment B called for the degradation of the L-6 levee, a flood protection structure built by the Corps.  When a modification to such a levee is going to occur, the Corps must also go through a Section 408 review under the Rivers and Harbors Act, 33 U.S.C. §408.  I was advised by the United States that a Section 408 review can take up to a year after a permittee makes a complete submission of information to the Corps.

The modification to the L-6 levee would have given the District the ability to handle more water in Compartment B than without the modification.  Tr. 676-77 (February 16, 2011). Rather than delay the beginning of treatment in Compartment B to allow the Corps to complete a time-consuming Section 408 review, the District decided to resubmit its Section 404 permit

application *without* a modification to the L-6 levee.  Tr. 695 (February 16, 2011).  As a result, the Corps can now review the application and eventually issue a permit without having to go through the Section 408 process.  The District would then be able to operate Compartment B, albeit with a diminished capability to move water compared to its original goal.  Tr. 682, 698 (February 16, 2011).

The District would still like to have the additional water treatment capacity that would be made possible by modification of the L-6 levee.   Tr. 676-77, 696 (February 16, 2011). Achieving this goal will require modeling to evaluate the impacts of the modification on the flood-protection purposes of the levee.  Tr. 678-79 (February 16, 2011).  Once reviewers began to evaluate this modeling exercise, they realized that there have been other changes over the last several years in the water movement capabilities of the District's South Florida plumbing works. As a result, the L-6 levee proposed modification has prompted a wider review of the flood protection structures in Water Conservation Areas 1, 2, and 3 that will result in a modeling exercise going beyond the L-6 levee.   Tr. 679-682, 684-85, 686-91, 692-93.   This wider modeling exercise will take longer than a model of just the impacts that might occur if the L-6 levee modification were permitted.[10]  From (1) my questioning of representatives of the District, the Corps, and the FDEP on February 16, 2011, and (2) assuming (a) application of an appropriate model showing no impacts on flood protection of the existing levee system in South Florida including modification of the L-6 levee, and (b) an otherwise successful conclusion to the Section 408 process, it will not be until 2014 or 2015 at the earliest before the District would

---

[10] It seems clear that the District could model alone the impacts of a modification of the L-6 levee and then submit a Section 408 permit application, but it was also clear from information provided to me that the District does not believe that the Corps would be able to reach a favorable decision on the application if this course were followed.  Tr. 686-91 (February 16, 2011).

be in a position to operate Compartment B as it originally conceived it would operate Compartment B. Tr. 684-685 (February 16, 2011).[11]

The constraint created by the reduced capacity to handle water in extreme events will also hamper the District's ability to treat water in Compartment B that otherwise would be destined for STA-3/4. The District will still be able to do so but only "up to the limited capacity or constrained capacity of the L6 canal in its existing condition." Tr. 699 (Mitnik) (February 16, 2011).

Based on what I was told by the Corps's representatives, without the L-6 modification, the Corps should be in a position to issue a permit to allow the District to operate Compartment B before July 2012. Tr. 669-72 (February 16, 2011). Based on the July 13, 2011 Combined Response, I can report that the public comment period for the Section 404 permit for Compartment B closed without any negative comments. July 13, 2011 Combined Response, p. 10. On June 28, 2011, the Corps asked the District for additional information or clarification on several topics, including the District's operational plan, an updated mitigation plan, an analysis of the change in STA effectiveness in light of the withdrawal of the L-6 levee modification, and an updated schedule. On the assumption that this information has been provided to the Corps, and with the understanding from the Corps that it anticipates permit issuance 60 days after receipt of this additional information, there should be ample time before July 2012 for the District to obtain the Section 404 permit from the Corps.

However, there is one significant caveat in this projection. For the Corps to issue a Section 404 permit, the Corps must receive a "water quality certification" from the State under

---

[11] The Section 408 process will take at least a year and it will not even start until the Corps has the results of modeling information. Completion of a model and generation of model output information appears to be at least 24 months away. Assuming a modification is approved, it would then have to be constructed. This adds up to something in the range of 2 to 3 years from today. Tr. 696-98 (February 16, 2011).

Section 401 of the Clean Water Act.[12]   Normally, the State would issue the certification at the same time that it issues its combined NPDES and Everglades Forever Act (EFA) permit under State law.  As discussed below, because of an injunction issued in the matter before Judge Gold, the State is currently restrained from issuing either of these permits.  Hence, the Corps might be delayed in issuing a Section 404 permit for Compartment B because the State may be delayed in issuing a water quality certification.

***Permit from the FDEP***

Second, the FDEP must issue a permit to the District to operate Compartment B.  From a status report I received on July 13, 2011, it is my understanding that the FDEP's permit was ready to be noticed for public comment.

The State permit would be issued under the EFA.  However, the State believes that Judge Gold's April 2010 Order in *Miccosukee Tribe of Indians of Florida v. United States* prohibits the State from issuing any EFA permits.  Tr. 1998 (May 17, 2011).  The United States agrees with this position.  *Id.*[13]

---

[12] Section 401, 33 U.S.C. § 1341, provides that an applicant for a Federal permit who wishes to conduct an activity which may result in a discharge into navigable waters has to provide the permitting agency with "a certification from the State in which the discharge originates or will originate."  The State must certify that at the point where the discharge originates, the discharge "will comply with the applicable provisions of sections 1311, 1312, 1313, 1316, and 1317 of this title."  Sections 1311 and 1312 address effluent limitations.  Section 1313 addresses water quality standards and state implementation plans.  Section 1316 addresses new buildings, structures, facilities or installation that will be discharging pollutants and Section 1317 addresses pretreatment standards for toxic pollutants.  The review necessary to issue a water quality certification typically is conducted as part of a state permitting process.  Whether the FDEP could issue a water quality certification outside of a permitting process is not a subject that has been broached to date in my discussions with the parties.

[13] Judge Gold wrote in pertinent part: "[T]he FDEP is enjoined from issuing any new NPDES permits, or modifications to existing NPDES permits-through State of Florida Administrative Orders, Everglades Forever Act permits or otherwise-for STAs that discharge into, or within, the Everglades Protection Area until such time as the State of Florida is found by the EPA and this Court to be in full compliance with the Clean Water Act, its implementing regulations, the Summary Judgment Order, and this Order. All new Administrative Orders and Everglades Forever Act permits issued under the laws of the

Judge Gold's April 2010 Order is on appeal to the Eleventh Circuit.   However, as allowed by Fed. R. App. P. 12.1,[14] Judge Gold issued an "indicative" ruling dated April 26, 2011 [DE 585, Civ. 1:04-cv-21448, (S.D. Fla.)] granting certain motions for either modification or clarification of his April 2010 Order.  The Indicative Order was prepared in part to respond to EPA's request to modify the Court's April 2010 Order (discussed below).  The United States and the State Parties agree that if the Indicative Order is entered, the State would then be free to issue EFA permits under State law for both Compartments B and C.   July 13, 2011 Combined Response, p. 6.

The Indicative Order however, does not take effect until the Eleventh Circuit decides to remand the matter to allow Judge Gold to enter his order.  A motion to remand to accomplish this purpose has been pending in the Eleventh Circuit since the United States filed it on April 28, 2011.[15]  On November 23, 2011, the United States renewed its motion to remand, presumably to remind the Court of Appeals politely that the motion had been pending then for seven months.

---

State of Florida must conform to, and comply with, the Clean Water Act, its implementing regulations, the Summary Judgment Order, this Order and the forthcoming Amended EPA Determination."  706 F. Supp. 2d at 1324.  While I feel confident Judge Gold would have figured out a way to ensure that the operation of additional treatment capacity under the Consent Decree in the form of Compartments B and C would not have been barred by this injunction had he known of this effect, the District was not a party to this action and it does not appear that any of the parties before Judge Gold brought the imminence of completion of Compartments B and C to his attention before appeals were filed.  Alternatively, had the District been able to complete Compartments B and C on the schedule that existed in 2006, the procedural roadblock now in existence might have been avoided.

[14] Rule 12.1 provides: (a) **Notice to the Court of Appeals.**  If a timely motion is made in the district court for relief that it lacks authority to grant because of an appeal that has been docketed and is pending, the movant must promptly notify the circuit clerk if the district court states either that it would grant the motion or that the motion raises a substantial issue.  (b) **Remand After an Indicative Ruling.**  If the district court states that it would grant the motion or that the motion raises a substantial issue, the court of appeals may remand for further proceedings but retains jurisdiction unless it expressly dismisses the appeal. If the court of appeals remands but retains jurisdiction, the parties must promptly notify the circuit clerk when the district court has decided the motion on remand.

[15] Among the reactions of the parties in Judge Gold's matter, the FDEP opposed the remand but sought an expedited briefing schedule.

Now, three months later and nearly a year after filing, the Eleventh Circuit still has not acted on the motion. If the flora and fauna of the Everglades could speak, they would be in tears begging the Court of Appeals to enter the motion to remand.  Until then, the operation of Compartments B and C to discharge water will remain sadly on the long list of delayed Everglades-restoration projects.[16]

If the Eleventh Circuit enters a remand order for the limited purpose of having the Indicated Order entered, the FDEP can move forward on issuance of the State EFA permit.  The State explained:

> If the Eleventh Circuit remands to Judge Gold for entry of the Indicative Order and Judge Gold does enter that Order, thereby removing the injunction against issuance of Everglades Forever Act (EFA) permits, FDEP will initiate the administrative process for EFA permit issuance.

July 13, 2011 Combined Response, p. 10.

The State also explained that if it were able to renew its EFA permitting authority by entry of the Indicative Order, it can provide the Corps with the Section 401 Certification as part of the EFA permit, thereby clearing the Corps to issue the Section 404 permit for Compartment B described above:

> To the extent a Section 401 certification of the Section 404 permit is necessary, and presuming the injunction restricting FDEP's EFA permitting authority is lifted, FDEP could exercise its Section 401 certification through EFA permits, which would be subject to FDEP's permitting standards and State administrative and judicial processes.

State Parties' September 12, 2011 Email Response.

---

[16] I delayed this Report in part because I kept expecting that the Eleventh Circuit would rule on the motion.  I finally decided that I should not wait any longer to issue this Report.

*Growth of Vegetation for Phosphorus Removal*

Third, the District's vegetation experts have to effect the growth of the right kinds of phosphorus-removing vegetation in the right locations of Compartment B.  To grow vegetation, there must be water.  Assuming sufficient water, the vegetation needed should be in place by July 2012.  July 13, 2011 Combined Response, p. 8, 10.

*Completion of Pumps*

Finally, pump stations to move water through Compartment B must be completed.  The District has a high degree of confidence that the pump stations will be completed and become operational by July 2012.  Tr. 676-77 (February 16, 2011); July 13, 2011 Combined Response, p. 10.

In sum, while the District does not have control over all of these variables,

(1) based on the information provided by the parties,

(2) subject to a limited remand by the Eleventh Circuit to permit entry of the Indicative Order so that the EFA permit process can be completed and the FDEP can issue a water quality certification to allow the Corps to complete the Section 404 permit, and

(3) subject to discussion of the NPDES permit hurdle below,

July 2012 is a realistic date by which stormwater can be treated in Compartment B and discharged.

## Compartment C

Compartment C has three flow ways, the northern, southern, and central.   Tr. 648 (February 16, 2011).  They became flow capable in December 2010.  Tr. 642 (February 16, 2011).  Again subject to the issuance of the Section 404 permit and an NPDES permit, July 2012 is a realistic date by which the northern and southern flow ways will actually treat water.  Tr. 667 (February 16, 2011). July 13, 2011 Combined Response, p. 6. The central flow way, however,

will not be available to treat water until June 2013 at the earliest. July 13, 2011 Combined Response, p. 7.

***Northern and Southern Flow Ways***

For the northern and southern flow ways, the same four events that must precede the beginning of phosphorus treatment operations for Compartment B apply to Compartment C.

The latest information provided to the Special Master is that the Corps should be in a position to issue an operations permit for the northern and southern flow ways before July 2012. Tr. 649-50, 666 (February 16, 2011); July 13, 2011 Combined Response, p. 6.

Assuming that the Eleventh Circuit acts favorably on a limited remand and the Indicative Order is entered in a reasonable period of time, as discussed above, the FDEP should be in a position to issue its notice of intent to issue an EFA permit to the District to allow treatment operations in Compartment C in time to allow water to be treated by July 2012, and to transmit to the Corps a Section 401 certification to support entry of the Section 404 permit.

Sufficient vegetation should be in place to treat phosphorus-laden water by July 2012. Tr. 654, (February 16, 2011); July 13, 2011 Combined Response, p. 2-3, 6. And pump stations now under construction should be operational by July 2012. Tr. 655 (February 16, 2011); July 13, 2011 Combined Response, p. 6.

***Central Flow Way***

The central flow way will be delayed before it can treat water for discharge but that delay will not interfere with the ability of the District to operate the northern and southern flow ways. Tr. 648, 653 (February 16, 2011). The delay is a result of the discovery, during construction, of Indian remains at four locations within Compartment C. The affected tribe, the Seminole Indian Tribe of Florida, has requested that the remains be kept in their original burial location. Tr. 644 (February 16, 2011). To honor the Seminole Tribe's request, the District has to design and

construct to the satisfaction of the Corps and the Tribe this part of Compartment C.  Tr. 644-46, 660.  When this process will be completed is not determinable with precision but the current best estimate is that by July 2013, the central flow way would be a position to be permitted to begin treatment operations.  Tr. 647 (February 16, 2011); July 13, 2011 Combined Response, p. 7.

## NPDES Permit Issues

The Clean Water Act regulates the discharge of pollutants to navigable waters. Discharges, however, can be allowed if an NPDES permit has been issued regulating the discharge.  The District will be in a position to treat water in Compartments B (within STA-2) and C (within STA-6) by July 2012 based on the assumptions set forth above.  It will not, however, be in a position to move that treated water out of Compartments B and C respectively and into the Everglades system without an NPDES permit or a modification to the existing NPDES permits applicable to STA-2 and STA-6.[17]

The United States advised me that it does not believe that NPDES permits will be in place by July 2012 because of "a number of procedural uncertainties and the time associated with completion of procedural requirements applicable to NPDES permitting, including administrative appeals."  United States' September 12, 2011 Email Response.

Let me set forth the procedural puzzle that is delaying the discharge of treated water from Compartments B and C.  Judge Gold's Orders dated July 29, 2008 and April 14, 2010 frame the puzzle.

### Judge Gold's July 2008 and April 2010 Orders

Judge Gold himself explained his July 29, 2008 Order:

---

[17] This is because, according to the parties, the Compartment B and C discharges will involve previously unpermitted outfalls and loads and flows that were not addressed in the applications for the existing NPDES permits for STA-2 and STA-6. See, e.g., United States' September 12, 2011 Email Response.

> In an Order entered on July 29, 2008 [DE 323] ("the Summary Judgment Order"), I concluded that the Environmental Protection Agency ("EPA") acted contrary to the Federal Clean Water Act, 33 U.S.C. § 1251, et. seq. ("CWA") or ("Clean Water Act") and the Federal Administrative Procedures Act. 5 U.S.C. § 701, *et. seq.* ("APA") or ("Administrative Procedures Act") when it determined that the 2003 amendments to Florida's Everglades Forever Act and the accompanying Phosphorus Rule did not change water quality standards in the Everglades Protection Area. I remanded with direction to the EPA, and enjoined the FDEP from granting permits that allowed discharges into, or within, the Everglades Protection Area based on the invalidated provisions and from otherwise enforcing the invalidated provisions. *See generally, Miccosukee Tribe of Indians of Florida v. United States,* 2008 WL 2967654 (S.D.Fla. July 29, 2008) (cited throughout as "[DE 323]").

706 F.Supp.2d at 1298, n. 1.  In his April 2010 Order, he added:  "As I explained at length in the Summary Judgment Order, the effect of the state law was to postpone the enforcement of WQBELs[18] until the year 2016. I unequivocally concluded that this was unacceptable and contrary to the federal Clean Water Act." *Id.* at 1301.

The FDEP's issuance of NPDES permits is governed in part by a 1995 Memorandum of Understanding (MOU) between the State and EPA.  Judge Gold's April 26 Order, p. 26.  Section IX of the MOU provides that EPA reserves the right "to initiate procedures for withdrawal of the State program in the event that the state legislature enacts any legislation or issues any directive which substantially impairs the FDEP's ability to administer the NPDES program or to otherwise maintain compliance with NPDES requirements."  *Id.*

Because Judge Gold had found that the Florida legislature impaired FDEP's ability to administer the NPDES program consistent with the requirements of the Clean Water Act for the Everglades STAs, Judge Gold directed EPA to invoke Section IX of the MOU to withdraw

---

[18]  A WQBEL is a water quality-based effluent limitation.  I discuss WQBELs for the STA permits in my January 4, 2011 Report, [DE 2235], 2011 WL 4595016 at *12-13.

FDEP's Clean Water Act permitting authority only as it relates to the STA permits within the Everglades Protection Area.  He directed EPA to:

> immediately initiate and carry out its authority under Section IX of the Memorandum of Understanding to withdraw approval of the State program pertaining to the issuance of any new NPDES permits for discharges into, or within, the Everglades Protection Area, or for any further modifications to existing NPDES permits (including through State of Florida Administrative Orders)….

706 F.Supp.2d at 1324.

Judge Gold also directed EPA to direct the FDEP to conform all NPDES permits for STAs 1-6 to his April 2010 Order and in a manner consistent with EPA's Amended Determination, and to file these conformed permits with the Court within sixty days of the date of the Amended Determination.[19]  706 F. Supp. 2d at 1324.

Judge Gold's April 2010 Order then was appealed. The State filed its Notice of Appeal on June 11, 2010, and the United States filed its Notice of Appeal on June 24, 2010. Judge Gold's April 26 Order, p. 17.

Thereafter, several pieces of the puzzles were identified.

### *The United States' Rule 60 Motion and the State NPDES Permits "Deemed" Submitted to EPA For Review*

On July 29, 2010, the United States filed a motion under Fed. R. Civ. P. 60(b) asking Judge Gold to, among other modifications, modify his April 14, 2010 Order because EPA does not have statutory authority to partially withdraw approval of a state Clean Water Act permitting program.  Because the appeal had been filed depriving the Court of jurisdiction, the United

---

[19] The Amended Determination was completed on September 3, 2010.

States proposed that the Court could act by entering an indicative order, a procedure I explained above.[20]

In November 2010, the State then presented model NPDES permits to Judge Gold to comply with requirements established by Judge Gold's April 2010 Order, including consistency with EPA's Amended Determination. The State explained, however, that it could not issue these NPDES permits without compliance schedules giving the District time to satisfy the obligations established by the Amended Determination. See Report of the Special Master, January 4, 2011, [DE 2291], 2011 WL 4595106 at *14-15 (explaining FDEP's position).

In its Rule 60 Motion, the United States, however, proposed an alternative to Judge Gold's directive to partially withdraw FDEP's NPDES permitting authority. The United States relied on EPA's authority to take over issuance of a specific NPDES permit if the FDEP's proposed NPDES permit does not satisfy EPA objections made as part of EPA's statutorily required review of a proposed permit. Judge Gold described EPA's alternative approach:

> First, the State submits new permits or permit modifications prepared for proposal to the EPA for review. If necessary, the EPA makes any required corrections prior to proposal. The State, after receipt and consideration of public comment, submits permits to the EPA for review. The EPA exercises its existing statutory authority to review permits for compliance with the CWA, implementing regulations, the Court's Orders, and the Amended Determination. If the EPA determines a permit does not conform and the EPA objects to permit, the authority to issue such permit transfers to the EPA, unless the EPA confirms in writing that the State has fully addressed the EPA's objections.
>
> ***
>
> The EPA argues that "this approach should produce the same functional outcome as partial program withdrawal whereby EPA

---

[20] In the Eleventh Circuit, the United States filed a Motion for Abeyance of the appeals of Judge Gold's April 2010 Order to allow Judge Gold to consider EPA's Rule (60)(b) motion. On August 30, 2010, the Eleventh Circuit granted the motion and the appeal remains on hold. State Parties' February 15, 2012 Report, p. 1.

would issue the permits." [ECF No. 446, p. 10]. This new provision would apply after existing permits have been conformed pursuant to Paragraph 3 of Section III.D of the April 14, 2010 Order. The "EPA believes that federal permitting can serve as an effective tool where a state is unwilling or unable to issue permits that fully comply with all applicable Clean Water Act requirements." [ECF No. 565, p. 8].

Judge Gold's April 26 Order, p. 32-33.

Judge Gold accepted this approach.  To get this review process started, Judge Gold then "deemed" the permits submitted in November 2010 by the FDEP to comply with Judge Gold's April 2010 Order as "submitted" to EPA for review:

I "deem" the permits filed by FDEP as "submitted" to the EPA for purposes of review under the Memorandum of Understanding between the EPA and FDEP.[21] I do so under my equitable and inherent powers, and as further sanctions for non-compliance. This action in turn triggers [a] number of legal consequences. As such, the proposed Indicative Order ("Appendix B") grants the EPA's Rule 60(b) relief, which I would enter following remand, as requested in the EPA's Submission in Response to the December 17, 2010 Order.

Judge Gold's April 26, 2011 Order, p. 5.

***The United States' Responses to the Deemed Permits***

The United States' February 15, 2012 Report, p. 2-3, described what happened and will happen next:

1. On June 27, 2011, EPA objected to the FDEP draft permits.

2. The FDEP then requested a hearing regarding EPA's objections as is allowed under the Clean Water Act.   33 U.S.C. § 1342(d)(2), (d)(4); 40 C.F.R. § 123.44(h).   The Sugar Cane Growers Cooperative of Florida, New Hope

---

[21] The MOU further provides that if the term of any permit is affected "in any manner by administrative or court action," the FDEP "shall immediately transmit a copy of the permit, with the changes identified" to EPA.  EPA then has thirty days "to make written objections to the changed permit" pursuant to Section 402(d) of the Clean Water Act. Judge Gold's April 26 Order, p. 26.

Sugar Company, and Okeelanta Corporation also requested a hearing but because the State requested a hearing, EPA must hold one. 33 U.S.C. § 1342(d)(4).

3.   EPA will hold the hearing on the objections beginning March 13, 2012.

4.   After the hearing, EPA will issue a responsiveness summary.  40 C.F.R. § 25.8.

5.   EPA must either affirm, modify, or withdraw objections and notify the State. 40 C.F.R. § 123.44(g).

6.   If EPA affirms or modifies its objections, the DEP may then submit revised permits that satisfy EPA's objections within 30 days of notification.

7.   If DEP elects not to do so, exclusive authority to issue the permits is transferred to EPA.  40 C.F.R. § 123.44(b)(2), (b)(3).

If EPA has to assume authority for issuing or modifying NPDES permits for the STAs, Judge Gold's April 26, 2011 Order described the process:

> For permits issued by the EPA, the EPA first publishes a proposed NPDES permit. The EPA then allows for public comment period of at least thirty days. The EPA responds to any significant public comments prior to issuing "final" permit decision. The EPA-issued permit is subject to federal administrative review procedures, including administrative review by the EPA's Environmental Appeals Board ("EAB") which must be sought within thirty days of permit issuance. Once the administrative review process is complete (including proceedings in response to any remand by the EAB), the permit becomes final and effective upon the Region's issuance of a final permit decision.

Judge Gold's April 26, 2011 Order, p. 29 (footnotes omitted).

The flora and fauna of the Everglades do not have to comprehend administrative procedure to recognize that STA-2, Compartment B and STA-6, Compartment C will not be

receiving new or modified NPDES permits anytime soon as a result of the above-described administrative processes.[22]

## Tribe's Submission

The Tribe made a submission (Tribe's September 14, 2012 Email Response) expressing its concern "by what appears to be a lack of a sense of urgency to see that Compartments B and C are operational by July 2012." Based on conclusions reached in Judge Gold's April 26, 2011 Order, the Tribe felt that there was "no reason that the Environmental Protection Agency cannot issue federal NPDES permits for Compartments B and C. There also should be no problem with the Corps issuing the 404 permit for operations or with FDEP issuing, or waiving, 401 water quality certification by that date." The Tribe argued "that if the State and Federal Parties had a

---

[22] EPA and the FDEP have been in negotiations for several months over an "alternative proposal from the one contained in EPA's Amended Determination intended to achieve the level of phosphorus in discharges from the STAs necessary to meet water quality standards in the Everglades." EPA "continues to engage in technical discussions with the State and is continuing its review of the proposal to determine whether the proposal would achieve the effluent limits necessary to meet the phosphorus water quality standards for the Everglades." United States' February 15, 2012 Report. I held a conference call with the parties on February 21, 2012 to gain a better understanding of the status of these "technical discussions" and was told by counsel that they could say no more than appears in the text above. I am holding another conference call with counsel on March 19, 2012 to determine the status of these negotiations and what the parties hope will happen if they are finally able to reach a technical consensus on the levels of phosphorus in STA discharges that will achieve water quality standards in the Everglades. The Special Master notes that discussions about the appropriate level of phosphorus in STA discharges to achieve water quality standards have been going on since 2005. Report of the Special Master (January 4, 2011), 2011 WL 4595106, *12-13 (S.D. Fla.) (explaining that EPA had reviewed eight drafts of a WQBEL between 2005 and 2010; that the FDEP derived a WQBEL that was presented to the Technical Oversight Committee on April 20, 2010 and described in a May 3, 2010 Technical Support Document but that the FDEP's technical work was then "overtaken," according to an FDEP witness, by Judge Gold's April 14, 2010 Order and EPA's Amended Determination). The Special Master understands the dollar impacts of the WQBEL determination or what has been argued to be its Consent Decree equivalent—a maximum annual discharge limit (see Report of the Special Master (January 4, 2011), 2011 WL 4595016 at *58-60) —and thus the technical contest over the data inputs and assumptions that go into that determination. But the parties need to understand that if they can't agree on them after what is now five years of general discussion and then more than two years of very earnest discussion, the Court is the final backstop and, to use a baseball metaphor now that the 2012 season is about to start, this game is closer to the ninth inning than the first inning.

proper sense of urgency about the damage that continues to take place in the Everglades, they would commit to do their utmost to see that Compartments B and C are permitted and operating by July 2012, or sooner."

The Tribe then made this plea:

> The Tribe, and its Everglades homeland, cannot tolerate any more open ended delay to remedy an interim violation in the Refuge that was found by the Court more than six years ago.  See DE 1935. As Judge Moreno noted in his 2005 Order on the interim violation, "This Court cannot enforce vague assertions about what will be done in the future, or what might be done based on certain other conditions first occurring.  There must be specific acts to be performed and specific dates by when those acts must be completed." DE 1935 at 15. Thus, the Special Master should recommend that a specific date, July 2012, be put into a Court Order to help ensure that the new delayed deadline is met. By so doing, the State Parties would be required to seek leave of the Court, and present evidence to support any further delay, if permitting or cultural resource issues interfere with meeting the date.  As Judge Gold stated, "It is now, and has been for a while, time to take concrete and substantial progress toward preserving the Everglades before this national treasure is permanently destroyed to the extent of irreparable destruction." [] (Judge Gold's April 26, 2011 Order) at 73.

Tribe's September 14, 2012 Email Response.

The permitting issues that will delay the operation of Compartments B and C go beyond the jurisdictional purview of the Consent Decree.  The case before Judge Gold affects each of the STA permits and what they must say to comply with the Clean Water Act.  The case before Judge Moreno affects the achievement of phosphorus water-quality standards to comply with the Consent Decree.  The former is based on legal requirements.  The latter is based on compliance sampling results within the Refuge, Shark River Slough, and Taylor Slough and the obligations of the State Parties to respond with additional STA acreage or regulatory measures if water quality standards are not being met or there is a violation.

In hindsight, in the matter before Judge Gold, the Tribe and the United States might have identified Compartments B and C as additional STA acreage that should be approved for discharge by modifying existing NPDES permits, even as the United States and the State of Florida work through compliance with Judge Gold's Orders.

However, we cannot turn back the clock.  Appeals were taken to the Eleventh Circuit. The Indicative Order has been written but can't be entered until the motion to remand is granted. The Eleventh Circuit has delayed acting on the motion to remand.  That has held up Judge Gold from amending his injunction to allow the FDEP to issue an EFA permit.  Until that occurs, the FDEP is prevented from issuing a water quality certification as part of the EFA permits thereby delaying the Corps' issuance of the Section 404 permit.  The FDEP also cannot issue an NPDES permit without EPA's approval.  EPA has objected to FDEP's "deemed" permits and now EPA and FDEP are in an administrative hearing process.  I do not say this happily, but I do not see how I can recommend that this Court order EPA and FDEP to take actions that they cannot take in the current procedural posture of Everglades STA permitting.

## Recommendation

Based on the information provided to me by the parties, in response to the question posed in the referral to the Special Master, it is my recommendation that

1. The Court determine that July 31, 2012 is a realistic date by which the District must be treating water in Compartment B and the northern and southern flow ways of Compartment C, subject to receipt of permits needed to discharge treated water as long as the failure or inability of the regulatory agencies to issue permits in time to meet this recommended deadline is not related to any acts or failure to act by the District.

2. As for the central flow way of Compartment C, the Special Master recommends that the Court direct the Special Master to issue a follow-up Report and Recommendation once the resolution of the cultural resource issues associated with the

central flow way is finalized and a construction plan and schedule have been approved by all stakeholders.

Additionally, I recommend that the Court hold a status conference as soon as practicable at which time it should explore with the parties every conceivable step within their authority to extricate, at a minimum, Compartments B and C from the administrative labyrinth that now surrounds NPDES permitting for the Everglades STAs.

Had the District kept to its original schedule, Compartments B and C would have avoided being held hostage to the fate of a motion to remand in the Eleventh Circuit and an EPA-FDEP fight over STA-NPDES permitting requirements.  Had the State of Florida and EPA taken Judge Gold's 2008 Order to heart, his 2010 Order may have been unnecessary.  Had ad valorem values not dropped precipitously, the budget issues that appear to be a major factor affecting the parties' litigation strategies might not have reduced funding to achieve compliance with the Clean Water Act and the Consent Decree.  Speculation about what might have been in the past is, of course, useless.  With respect to the future, there is no speculation.  Unless the parties take timely, irrevocable, properly-funded steps to advance the progress of Consent Decree compliance in the face of the administrative and technical challenges that remain to achieve water quality standards for phosphorus within the Everglades Protection Area, the Court will have to consider its options to keep the parties to the words of their Settlement Agreement.  The parties agreed to allow that document to be embodied in a Consent Decree and that means that the force of federal judicial power, when properly invoked, is available to ensure that the parties honor the terms of their bargain.

DATED:  March 1, 2012                                     Respectfully Submitted,

                                                                         /s/ John M. Barkett____
                                                                         John M. Barkett, Esq.
                                                                         Special Master