UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Miami Division

**Case Number: 88-1886-CIV-MORENO**

UNITED STATES OF AMERICA,

    Plaintiff,

vs.

SOUTH FLORIDA WATER MANAGEMENT
DISTRICT *et al.*,

    Defendants

_____/

### REPORT OF THE SPECIAL MASTER (SEPTEMBER 6, 2013) AS A SECOND SUPPLMENT TO THE SPECIAL MASTER'S MARCH 1, 2012 REPORT

In the Court's "Order Granting Motion to Adopt the Special Master's Report, Motion Seeking Declaration of Violations, and Motion for Declaration of Breach of Commitments" dated March 31, 2010 ("March 31 Order") [DE 2134], the Court instructed me to recommend "realistic mutually-agreeable deadlines" for the completion of projects listed on Appendix A to the Report of the Special Master (July 5, 2006) [DE 1976]. March 31 Order, p. 16. At the time, there were two Appendix A projects not yet completed: stormwater treatment areas (STA) referred to as "Compartments B and C." Based on information available as of March 1, 2012, I established realistic deadlines for operation of both projects in my Report and Recommendation to the Court as of that date.

At the request of the parties, the Court held this matter in abeyance for a considerable period of time to allow the parties to engage in discussions on the Maximum Annual Discharge Limit (MADL) that was one of the subjects of my January 4, 2011 Report and Recommendation

1

approved by the Court by Order dated September 30, 2011 [DE 2291]. As a result of stays allowed by the Court, the Court did not rule on my March 1, 2012 Report and Recommendation.

The parties eventually agreed on the MADL.

Upon motion of the State Parties, the Court then held a hearing on March 25, 2013 to hear argument on all pending issues. As a result of discussions at that hearing, the Court directed me to supplement my March 1, 2012 report with updated information on the current operational status of Compartments B and C. Based on updated information provided to me by the South Florida Water Management District in emails dated November 2, 2012 and March 25, 2013, I provided the Court with a supplement dated March 29, 2013 to my March 1, 2012 Report.

By Order dated August 11, 2013, the Court adopted my Report dated March 1, 2012 as supplemented by my Supplemental Report dated March 29, 2013. In the Court's August 11, 2013 Order [DE 2412], the Court acknowledged the continuing pendency of the State Parties' Motion Seeking Declaration of Compliance with the Court's September 30, 2012 Order and Withdrawal of Reference to Special Master. The Court stated that it would address this issue in a separate order.

In a footnote in my March 29, 2013 Supplemental Report, I explained:

> The last remaining issue in the Court's March 31, 2010 Order—remedies for the violation of the Long Term level in the Loxahatchee Wildlife Refuge (Refuge)—was the subject of extensive hearings in 2011. Because of the settlement discussions of the parties, I deferred preparation of a Report and Recommendation on remedies. The parties have now agreed on a number of projects that the District is or will be undertaking. That agreement was made to resolve issues associated with the Clean Water Act litigation presided over by Judge Gold and discussed at length in my March 1, 2012 Report. The parties, however, could not reach an accord on whether their agreements with respect to the Clean Water Act litigation represented a final resolution of the Consent Decree violation, and, in particular, whether this Court need take any further action by way or order or otherwise with

respect to the violation. Whether the Court still wants the Special Master to prepare a Report and Recommendation thus remains an open issue. Based on the views expressed by the Court at its March 25, 2013 hearing, the Special Master will await further direction from the Court on whether the Court wishes to receive the Special Master's views on the need for the Court to do anything further in response to the violation of the Long Term level that prompted the referral in the Court's March 31, 2010 Order.  Should the Court seek those views and to ensure that the Court is fully informed before providing them, the Special Master would want the time to first hear more details from the parties on the certainty of the funding for, and the current planned scope of and timing for completion of, the agreed-upon projects that relate to protection of the Refuge.  The Special Master would also like to receive information generally on the scientific research that is to accompany this work since that research may affect the timing, scope, and cost of the projects designed to achieve the MADL for the Refuge.  Finally, the Special Master would want to have the parties explain the enforcement process that now is in place at the State level so that the Court can account for that enforcement mechanism in considering how the Court might wish to proceed.

After the Court's August 11, 2013 Order, I convened telephone conferences with the parties to attempt to develop a summary of the legislation adopted by the Florida legislature during the 2013 legislative session that could be agreed upon by all the parties and the intervenors, since I thought it might assist the Court.

I am filing this Second Supplement to Special Master's March 1, 2012 Report with the results of my efforts.

## Views of the Parties

I was unable to achieve a consensus among all of the parties and the intervenors on the results of the legislative session as they relate to the pending matters before the Court.  I set forth below the views of the parties.  I advised the parties that if I did not accurately capture their positions, they would have the opportunity to respond within the time limits allowed for responding to a report of a special master.

3

**State Parties.**[1]  The State Parties have provided me with the following description of their view of the impact of the legislative session:

> As set forth in the State Parties' September 17, 2012, Status Report (DE 2354) and their Motion Seeking Declaration of Compliance with September 30, 2011, Order and Withdrawal of Reference to the Special Master (DE 2370), the State Parties developed and implemented a comprehensive plan to permit and construct an $880 million suite of projects, (not including money already paid for land to be used for projects or swaps), to further improve water quality in the Everglades.  As of October 10, 2012, the final permits and associated Consent Orders issued by FDEP to the District to implement the State's plan became effective and enforceable, thereby authorizing the continued operation and maintenance of the existing Everglades Storm Water Treatment Areas (STAs) and requiring a suite of new restoration projects including the construction and operation of treatment area expansions and water storage features.
>
> On May 28, 2013, Governor Rick Scott signed into law CS/HB 7065, Everglades Improvement and Management, which subsequently became Chapter 2013-59, Laws of Florida.  This legislation amends the Everglades Forever Act and authorizes funding for the 2012 Restoration Strategies Regional Water Quality Plan (Restoration Strategies).  HB 7065 has the support of key environmental organizations and agricultural stakeholders, and unique to the Everglades legislation, passed the Legislature with no final objections from any quarter.
>
> House Bill 7065 passed the House of Representatives on March 22, 2013 and subsequently passed the Senate on May 2, 2013.  Section 2 of CS/HB 7065 provides, in full, as follows: "Beginning in the 2013-2014 fiscal year, and each year thereafter through the 2023-2024 fiscal year, the sum of $12 million in recurring general revenue funds and $20 million in recurring funds from the Water Management Lands Trust Fund is appropriated to the Department

---

[1] When I refer to the participants, I do so as follows.  The State of Florida Department of Environmental Protection is "FDEP."  The South Florida Water Management District is the "District" or "SFWMD."  Together they are the "State Parties."  The United States of America is the "United States."  The Miccosukee Tribe of Indians of Florida is the "Tribe."  Florida Audubon Society is referred to as "Audubon."  Sierra Club, National Wildlife Federal, Florida Wildlife Federation, Defenders of Wildlife, National Parks Conservation Association, Florida Chapter Sierra Club, and Audubon Society of the Everglades are the "Conservation Intervenors."  West Palm Beach County Farm Bureau, K.W.B. Farms and Roth Farms, Inc. are "Farm Interests."  United States Sugar Corporation is "U.S. Sugar."

4

of Environmental Protection for the Restoration Strategies Regional Water Quality Plan. This section shall take effect on July 31, 2013." This law establishes long-term funding for the $32 million per year required to complete Restoration Strategies. As stated in House of Representatives Final Bill Analysis of Bill # CS/HB 7065, "Implementation of the technical plan is estimated to cost $880 million. The SFWMD is proposing to fund the plan through a three-part strategy that includes a combination of state and SFWMD revenues consisting of cash reserves from the SFWMD, ad valorem revenues collected by the SFWMD, and state appropriations." The combination of this appropriation and the funding by the District total $880 million.

Consistent with the presentation made to the SFWMD Board in June 2012, a copy of which is attached, the design and construction of the treatment and storage projects in the Restoration Strategies Regional Water Quality Plan will take place in three phases over a planned twelve (12) year timeframe, with completion of all projects set for 2025. Work is already underway on several components for the plan's first two phases, which are scheduled to be finished by 2016 and 2018, respectively.

In sum, this legislation authorizes and completes the funding for the District's technical plan to complete six projects that will create more than 6,500 acres of new STAs and 110,000 acre-feet of additional water storage through construction of flow equalization basins. State law now requires completion of Restoration Strategies and provides dedicated funding, clearing away the only perceived hurdles to successful implementation of the Restoration Strategies and further cementing Restoration Strategies as a landmark environmental accomplishment.

The presentation to the District Board referred to above is a one-page document entitled, "Key Projects, Construction Schedule." It is attached to this Second Supplemental Report. It depicts the projects on a map with a timeline at the top of the map.

**United States.** The United States has advised me that it does not object to the above summary as the State Parties' own perspective on the outcome of the Florida legislative session.

Without providing me with a complete list of the points that the United States might raise in response to the State Parties' perspective, the United States did remind me of, or told me, the following:

- The United States opposes the State Parties' Motion Seeking Declaration of Compliance and does not agree with the State Parties' characterizations in the first paragraph of the State Parties' statement.
- Noting that the State Parties' plan is proposed for implementation over a twelve-year period, the United States would not agree that "the State Parties [have already] . . . implemented" the State Parties' plan.
- The United States also was unclear what "perce[ptions]" form the basis for the statement that this year's state legislation has "clear[ed] away the only perceived hurdles to successful implementation of Restoration Strategies."
- Given that the state plan is proposed to be implemented over the next 12 years, it was not clear to the United States how 2013 legislation has "complete[d]" the funding for the plan.

**Conservation Intervenors, Audubon, and Tribe.** These groups also did not accept the characterizations in the first paragraph of the State Parties' statement.

They were a bit more direct on funding than the United States. One or more of them was concerned that the State Parties' statement gave the impression that funding was assured for the period between now and 2024, whereas, any future legislature could decide not to appropriate annually-needed funds for the Everglades projects shown on the attachment, they stated.

They also took issue with a potential impression that there are fixed deadlines in the legislation by which projects must be completed[2] when that is not the case, they stated.[3]

---

[2] The State Parties' projects are being implemented under permits that contain a schedule for completion of the projects. It is not yet clear to the Special Master what the enforcement mechanism would actually be should a permit deadline not be met, or how facile it might be to change permit deadlines.

[3] The Conservation Intervenors also were concerned about the legislation's impact on Best Management Practices (BMPs)—referring to the efforts of Farm Interests and U.S. Sugar to reduce the amount of phosphorus leaving their properties. While I did not study the issue in any depth, and therefore express no views on the merits of this concern, the District's counsel advised me that the District's regulations on BMPs were not being changed because of the 2013 legislation. Conservation Intervenors, Audubon, and the Tribe also questioned whether the legislation could provide a vehicle to change designated uses of the Everglades under the Clean Water Act and Florida's implementation of the Clean Water Act after the projects were completed and depending upon the success of the projects. I also did not study this question in depth. While there was disagreement over this interpretation of the legislation, it is far enough off that I do not see a reason to discuss it further here. I do recognize that the science of phosphorus removal continues to evolve and it is my understanding that we are not yet at the point where any informed scientist will provide an ironclad guarantee that the State Parties' projects will, in fact, achieve the MADL.

**Farm Interests and U.S. Sugar.**  As I understood the Farm Interests and U.S. Sugar, these intervenors support the State Parties' statement in full.

## Observations

There is no question that the Governor and the Florida legislature took a very large first step toward satisfying the obligations under the permits issued by the FDEP to the District as part of the resolution of the matter before Judge Gold.  They should be applauded for this effort.  Anyone interested in Everglades restoration should be cheering for the success of the State Parties' projects.

There is also no question that past Everglades-restoration promises have not always been realized, or realized in a timely manner, for a variety of reasons that I have cataloged in part in past reports.

The questions that I raised in footnote 1 of my March 29, 2013 Supplemental Report which is quoted above remain the ones for the Court's consideration.  What separates the parties is still whether under the terms of the Consent Decree the Court need take any further action by way of an order or otherwise with respect to the violation that prompted the referral to the Special Master, to ensure that the State Parties' projects are implemented in a timely manner as proposed or as they might be modified as the scientific research progresses.

DATED:  September 6, 2013.

                                      Respectfully Submitted,

                                      /s/ John M. Barkett____
                                      John M. Barkett, Esq.
                                      Special Master